(No. 62082.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WALTER WHITE, Appellant.

*Opinion filed August 17, 1987.*

196

SIMON, J., concurring.

James J. Doherty, Public Defender, of Chicago (Deborah A. White and Ronald P. Alwin, Assistant Public Defenders, of counsel), for the appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., Kenneth T. McCurry and Virginia M. Bigane, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE CLARK delivered the opinion of the court:

On September 6, 1982, the defendant, together with three other persons, was charged by indictment in the circuit court of Cook County with the offenses of murder, armed violence, and conspiracy (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 33A—2, 8—2). Thereafter, defendant filed a motion to suppress several statements he made while in custody on the basis that these statements were obtained in violation of his fifth, sixth, and fourteenth amendment rights. During the hearing on this motion the defendant filed a second motion which requested that his arrest be quashed and his statements suppressed on the basis that these statements were obtained in violation of his fourth and fourteenth amendment rights. More specifically, the defendant's second motion contended that he was illegally arrested in his home without a warrant, in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Although the trial court denied the defendant's first motion to suppress, finding that the defendant's in-custody statements were voluntarily given, it sustained the defendant's second motion, suppressing the statements as the product of an unlawful arrest.

The State appealed this decision to the appellate court. Apparently because of a clerical error in the Cook County public defender's office, the defendant filed no brief in the matter. In an unpublished order the appellate court reversed (132 Ill. App. 3d 1162), holding that exigent circumstances justified the warrantless arrest of the defendant. The court went on to hold that, even in the absence of exigent circumstances, the defendant's warrantless arrest was not precluded by *Payton* because it did not occur in his home. We granted the defendant's petition for leave to appeal (103 Ill. 2d R. 315(a)).

On August 12, 1982, Charles Dickens was shot to death at 905 South Pulaski Avenue in Chicago. Approximately 10 to 15 minutes later, four to five blocks away, Lonell Copeland was killed in the 3800 block of West Roosevelt Road. Two alleged eyewitnesses to these killings, James Smith and Wilbur Johnson, talked to certain Chicago police officers sometime thereafter and implicated the defendant. The record does not reveal whether both Smith and Johnson, or either of them, witnessed both killings. Both Smith and Johnson were later indicted with the defendant.

On August 19, 1982, Detectives James Antanocci and Allen Jaglowski were assigned to investigate the Dickens and Copeland killings. Learning from police reports that the defendant was implicated in the killings, they began to search for him. Over the next several days the detectives canvassed several different addresses found in the defendant's criminal history, Chicago Housing Authority records, public aid records, State driver's license records, and police reports. At no time during their investigation did they seek a warrant for his arrest.

On August 19 they went to 624 North Albany Street, an address listed as the defendant's home in one of the police reports. When they arrived at this address they found it to be a building which had suffered fire damage

and was apparently unoccupied. Failing to find the defendant at this address, they then went to 700 North Harding Street, listed in the police reports as the address of the defendant's sister. They were again unsuccessful in finding the defendant. On the next day, August 20, they went to 2236 South Federal Street, a Chicago Housing Authority project building. The detectives derived this address from the defendant's prior criminal history. Upon arrival they learned that the defendant was no longer residing there but that apartment 408 had previously been rented to Edna Mae White, the defendant's wife. The detectives then investigated two other addresses, 4436 West 19th Street and 3130 West Flournoy Street, which had been listed as the defendant's addresses on his application for a driver's license and in his prior criminal history, respectively. According to the defendant, 4336 West 19th Street was the site of his mother-in-law's home. The detectives were unable to find the defendant at either location. However, persons at the Flourney Street address informed them that the defendant's mother lived at 13161 South Corliss Street. Both detectives then went off duty and did not resume their investigation until August 23.

The record reveals, and the trial court found, that the defendant was actually staying during this time at the home of his oldest brother, Michael Jerome Loving. According to the defendant, he had been living with his wife at the Federal Street address until sometime during the summer of 1982. He ceased living there after his wife left him and went to California. Thereafter he stayed "off and on," with his brother, his sister, and his mother. On August 23, he had been staying with his brother for approximately seven days. The defendant's brother and sister-in-law, Vivian Loving, both testified to the same effect. So far as the record reveals, the defendant had no permanent address at that time. Vivian Lov-

ing testified that she did not know where the defendant "normally" lived, that he was "just staying" with the Lovings, and that their house was not his "home." The defendant's mother, Desiree White, testified that the defendant's "normal" address was on Federal Street, but that he was "staying with" his brother on August 23. She also stated that, as of August 23, he had no "permanent" address.

The defendant was not receiving mail at his brother's apartment, and his name was not on the bell. The record does not reveal whether he kept any or all of his clothes and possessions at his brother's apartment, or whether he was given a separate room of his own. The record also does not reveal whether his brother had placed any time limit upon the defendant's stay at the brother's apartment, or whether the defendant himself planned to leave at any definite time in the future.

On August 23, Detectives Antanocci and Jaglowski, together with Detective McNamon, resumed their search for the defendant. They went to 13161 South Corliss Street and spoke with the defendant's mother, Desiree White. She told them that she was aware that the defendant was wanted by the police. She went on to say that she had spoken with the defendant the night before. She had informed the defendant that the police were looking for him. According to his mother, the defendant had replied that he did not commit the offenses and that he was going to surrender to the police. The defendant's mother then told the detectives that the defendant could be found at Michael Loving's home at 10951 South Michigan Avenue. She agreed to accompany them to Loving's apartment in an attempt to find the defendant.

The building at 10951 South Michigan Avenue is a two-story building with a storefront on the first floor and two apartments on the second floor. The Loving family occupied the apartment in the rear of the build-

ing, away from the street. To reach the Loving apartment one would have to pass through two doors, one opening on the sidewalk, and a second at the top of a flight of stairs. Between the two doors there was a hallway and the single flight of steps. Both doors were normally kept locked. Visitors rang a bell at the outside door, but there was no intercom. The outside door was opaque, with a mail-slot at the bottom. At the rear of the apartment was a porch, which could be reached from the rear bedroom. While normally an outside stairway led from the backyard to the porch, it had been partially removed for repairs.

Desiree White and the three detectives arrived at 10951 South Michigan Avenue at approximately 9:30 a.m. on the morning of August 23. While White rang the bell, Detectives Antanocci and McNamon stood behind her. Michael Loving and his family were eating breakfast. When he heard the bell ring, Loving descended the stairs to the first floor. When he heard his mother call out: "It is me, Michael," he opened the door. As he opened it, the two detectives stepped around White and entered the hallway. They did not ask permission to enter or announce their purpose. They also did not draw their guns. White then asked Loving if the defendant was there. Loving, feeling that "something wasn't right," at first denied that the defendant was present. When White asked again, Loving admitted the defendant's presence. The two detectives then went up the stairs to Loving's apartment. Loving followed them up and pushed past them while they were on the stairs. At no time during these events did he give them permission to enter.

The two officers reached the top of the stairs and entered the kitchen area of the Loving apartment. They then started for the Loving children's bedroom. As they were about to enter the bedroom, Loving called out: "Wait a minute." The two officers then drew their guns.

Vivian Loving told them: "You ain't got to do that, my kids is in here." The defendant then stepped out of the children's bedroom and into the kitchen area.

While these events were taking place, Detective Jaglowski had gone to the rear of the building where a rear exit from Loving's apartment opened onto a rear-porch area which connected the apartment to the ground via a "fairly well-broken down staircase." While Jaglowski was standing in the alley behind Loving's apartment, he observed the defendant walk out of the rear door and across the porch. The defendant then made eye contact with Jaglowski, turned around and went back towards the rear door. Jaglowski called out to his fellow officers that the defendant was attempting to escape and also called to the defendant: "Stop! Police!" Defendant reentered Loving's apartment. Jaglowski then made his way up the staircase, drew his gun, and knocked on the rear door. According to Jaglowski, one of the defendant's relatives unlocked the rear door and let him enter. Jaglowski then went through the rear bedroom. He holstered his gun when he saw the defendant speaking with the other detectives and the defendant's mother, who had followed them up the stairs.

The defendant talked with the detectives and his mother for several minutes. His mother urged him to go with the officers and tell them the truth. The defendant agreed to go with the officers. Before he left he removed some jewelry he was wearing and handed it to his brother. The defendant was not placed in handcuffs during the ride with his mother to the police station.

The defendant arrived at the station at approximately noon on August 23. He was separated from his mother and placed in a small interrogation room, without a clock or windows.

The defendant was first interrogated by Detectives Antanocci and McNamon. According to Antanocci, McNa-

mon advised the defendant of his constitutional rights and received assurances from the defendant that he understood those rights. The defendant was then questioned about the killings. Antanocci testified that neither of the detectives threatened or beat the defendant in any way during the time that they were interviewing him.

At approximately 5 p.m. on August 24, 1982, the defendant was interviewed by Detectives Gary Bulava and James Hanrahan. According to Bulava, these two detectives gave the defendant his *Miranda* rights and again the defendant indicated that he understood them. During the one-hour interview the defendant confessed his participation in the killings. Detective Bulava also testified that he and Detective Hanrahan neither physically nor psychologically coerced the defendant during the interview.

Later that evening, Assistant State's Attorney Thomas Roche interviewed the defendant in the presence of Detectives Bulava and Hanrahan. Roche testified that he informed the defendant of his *Miranda* rights, and the defendant once again stated that he understood those rights and wished to speak with Roche. According to Roche, he then questioned the defendant for approximately 30 minutes about the homicides and the defendant again confessed his participation. However, the defendant refused to make any written statement. Roche also testified that he did not coerce the defendant. Roche further testified that he saw no evidence that the defendant had been physically injured.

At approximately 9 a.m. on August 25, 1982, nearly 45 hours after the defendant arrived at the stationhouse, the defendant was formally placed under arrest. Prior to 6 p.m. that same day, the defendant attempted to kill himself in the interview room by slashing his wrists with a jagged piece of metal. Detective Clarence Thedford intervened after one of the codefendants, who was in an adjacent interview room, alerted the detective to the

defendant's actions. Thedford was able to stop the bleeding, and the defendant was transported to the hospital.

According to the defendant, neither the detectives nor the assistant State's Attorney ever informed him of his *Miranda* rights. He testified that two detectives beat him and threatened him. The trial court sustained the defendant's second motion to suppress the confessions on the basis that they were the product of an illegal warrantless arrest at the defendant's home in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. The trial court denied the defendant's first motion to suppress on the basis of the fifth amendment, finding that the police officers did not physically harm the defendant and that the statements he made were voluntary.

The appellate court reversed, finding that the warrantless arrest of the defendant was justified by exigent circumstances, principally because "the police had substantial reason to believe that the defendant was an armed murderer of two individuals who was attempting to avoid detection by the police by staying at the residences of several relatives." Alternatively, the court held that *Payton* did not apply to the defendant's arrest because the Loving apartment could not be considered the defendant's home for *Payton* purposes. The court found that defendant had been staying with his mother on the evening prior to his arrest and had gone to the Loving apartment in order to avoid detection by the police. Because of its resolution of these two issues, the court did not reach the State's additional contentions that the statements should not be suppressed because Michael Loving had given his consent to the police entry, that the statements were not the product of the illegal arrest, and that the defendant accompanied the police to the station voluntarily.

On this appeal the State argues that: (1) *Payton* does not mandate suppression of the defendant's confession because the defendant was not arrested in his own home; (2) even assuming *Payton* applies, exigent circumstances justified the defendant's warrantless arrest; (3) even if there were no exigent circumstances, the police had Michael Loving's consent to enter the Loving apartment; and (4) even assuming the defendant's arrest was unlawful, the defendant's confession was not tainted by his unlawful arrest. Bearing in mind that a ruling of the circuit court on a defendant's motion to suppress will not be set aside unless clearly erroneous (*People v. Clark* (1982), 92 Ill. 2d 96, 99), we examine each of these contentions in turn.

The State first argues that the Loving home was not the defendant's home under *Payton*, and that therefore the police did not have to seek a warrant for his arrest. Under *Payton*, the police may not, absent exigent circumstances, enter a "suspect's home" to arrest the suspect without a warrant for the suspect's arrest and reason to believe that the suspect is within. (*Payton v. New York* (1980), 445 U.S. 573, 574-75, 602-03, 63 L. Ed. 2d 639, 643-44, 660-61, 100 S. Ct. 1371, 1374, 1388.) While the State cites cases dealing with the question of whether a suspect arrested at, on, or near the threshold of his dwelling has been arrested in his home (see, *e.g., United States v. Holland* (2d Cir. 1985), 755 F.2d 253), the State has not cited, nor has our research disclosed, any cases dealing with the question of when, and under what circumstances, a defendant can claim that a particular residential premises is his home under *Payton*. Thus, this case presents an issue of first impression.

While *Payton* itself does not contain any definition of a suspect's home, it does provide some guidance on this question. The significance of an individual's home for fourth amendment purposes is that it provides a clearly

defined "zone of privacy," bounded by "unambiguous physical dimensions." (*Payton v. New York* (1980), 445 U.S. 573, 588, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1381.) The protection granted this "zone of privacy" is rooted in the clear and specific constitutional guarantee that "[t]he right of the people to be secure in their *** houses *** shall not be violated." (U.S. Const., amends. IV, XIV.) Thus at the " 'very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " (*Payton v. New York* (1980), 445 U.S. 573, 589-90, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382.) The State argues that the "ambit" of a suspect's home for *Payton* purposes is to be narrowly defined. We do not agree. This language suggests to us that the importance of the guarantee against physical intrusion into the home mandates a liberal construction for claims that a particular place is a suspect's dwelling. It also suggests that whether a particular place is to be deemed a suspect's home will depend upon whether the suspect's association with a particular place provides that suspect with a reasonable expectation of privacy such that he would be justified in believing that he can retreat there, secure against governmental intrusion.

Our conclusion is strengthened by the fact that the Supreme Court has also held that the police must secure a search warrant to arrest a suspect in the home of a third party. (*Steagald v. United States* (1981), 451 U.S. 204, 216, 68 L. Ed. 2d 38, 48, 101 S. Ct. 1642, 1649-50.) Thus *Payton* and *Steagald* combined teach us that the police should, absent exigent circumstances, seek either an arrest warrant or a search warrant when they plan to arrest a suspect in *any* dwelling. Of course, the suspect arrested in the home of a third party may not have standing to object to the search of that third party's home. (See *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L.

Ed. 2d 387, 99 S. Ct. 421.) But the general injunction to seek warrants prior to entering dwellings is clear. Moreover, the dissenters in *Steagald* apparently contemplated that a *Payton* home is to be broadly defined: "If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his 'home' for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if the suspect concurrently maintains a residence elsewhere as well." (*Steagald v. United States* (1981), 451 U.S. 204, 230-31, 68 L. Ed. 2d 38, 57, 101 S. Ct. 1642, 1657 (Rehnquist, J., dissenting).) Indeed, a broad definition of a suspect's home makes the task of the police easier, since to enter the suspect's home the police need only an arrest warrant and probable cause to believe the suspect is within, whereas to enter the home of a third party the police also need a search warrant.

Thus, in the context of defining the suspect's home for *Payton* purposes, a suspect's expectation that he will not be subject to a warrantless arrest in a particular place will be deemed reasonable where his own behavior and the behavior of others support the belief that the place of arrest is the suspect's home. *Payton* protects the interest in freedom from seizure of one's person while within the confines of a place where it is reasonable to believe that one's person will be inviolate. While common law rules of property rights are not determinative, the reasonableness of a particular belief may be established, in part, by reference to such rules. In the usual case, a showing that the suspect has an immediate possessory interest in the place of arrest, either as owner-occupant, tenant, subtenant, or hotel guest, may be all that is necessary to establish a "home" for *Payton* purposes. The legal right to exclude others which such a possessory interest entails may carry

with it, as a corollary; the right to be free also from governmental intrusion.

In the absence of such a possessory interest, a suspect may still be entitled to consider a particular place his "home." For example, the unemancipated children or dependents of the possessor may be entitled to consider the possessor's home their own. On the other hand, mere physical presence in a particular place may not suffice to establish a "home" for *Payton* purposes. A suspect who has his own home and stays temporarily as the guest, invitee, or visitor at the home of another may not claim his host's home as his own.

If, however, the suspect does not have a home to which he can return, the suspect may, under the proper circumstances, be entitled to claim the host's home as his own for *Payton* purposes. Whether he can do so will depend upon the particular facts and circumstances of the case. Of crucial significance will be the intention of the parties. If both host and suspect contemplate that the suspect remain indefinitely, the host's home will be considered the suspect's home. An intent to remain indefinitely may be inferred either from subjective evidence of the desires of the parties or from objective evidence. Factors to be considered include, but are not limited to: (1) whether the suspect is physically present at the host's residence for a substantial length of time prior to his arrest; (2) whether the suspect maintains a regular or continuous presence in the host's residence and particularly whether he sleeps there regularly; (3) whether the host grants the suspect exclusive use of a particular area of the host's residence; (4) whether the suspect stores his clothes or possessions in the host's residence; (5) whether the suspect receives mail at the host's residence or has his name on the door; (6) whether the suspect contributes to the upkeep of the host's

household, monetarily or otherwise; and (7) whether the suspect and the host are related by blood or marriage.

The assessment of all of these factors, and the ultimate determination of whether the suspect was arrested within his home, are matters to be determined in the first instance by the trial court, and the trial court's determination will not be overturned upon review unless manifestly erroneous. (See *People v. Clark* (1982), 92 Ill. 2d 96, 99.) While the record in this case is somewhat sparse, we cannot conclude that the trial court's decision was manifestly erroneous. The defendant was no longer living with his wife in the Federal Street apartment, and so far as the record shows, he had no possessory interest either in that apartment or in any other. Either his home was the Loving home or he had no home. The defendant's sister-in-law, the defendant's brother, and the defendant all testified that the defendant had continuously resided at the Loving apartment for seven to nine days prior to his arrest. Neither of the Lovings indicated that they had placed any time limit upon the length of the defendant's stay. Particularly given the blood relationship between the defendant and Michael Loving, the record supports the trial court's conclusion that the Loving home was the defendant's home.

The appellate court's contrary conclusion is apparently based on a misreading of the record, as is the State's argument here. The appellate court believed that the "defendant's mother testified that on the evening before his arrest, defendant was staying with her and was aware at the time that the police were looking for him." In fact, the defendant's mother merely reported that she had told the defendant on the evening before his arrest that the police were looking for him. She did not state, and was not asked, where that conversation took place. While she was never asked directly where the defendant had been staying during the seven to nine days immediately prior

to August 23, her testimony is fully consistent with the testimony of the other witnesses that the defendant was staying at the Loving apartment. She stated that she "was not sure how long" the defendant had been staying with the Lovings—testimony inconsistent with the State's argument that the defendant had been staying with her on the evening of August 22. She stated that she had seen the defendant at the Lovings during visits there, and that the defendant had no other permanent address. Moreover, even assuming that her testimony conflicted with that of the Lovings and the defendant, the trial court was free to disregard her testimony, or any portion of it, in favor of the testimony of the other witnesses. *People v. Clark* (1982), 92 Ill. 2d 96, 99.

The State also contests the trial court's determination on other grounds, citing evidence that the defendant had previously been living with his wife, sister, and mother during the summer of 1982, and that the defendant neither kept his name on his brother's apartment nor received mail there. These facts, while certainly relevant to the question of whether the Loving apartment constituted the defendant's home, are not determinative. Given the length of the defendant's stay, the defendant's lack of any other permanent address, and the blood tie between the defendant and Michael Loving, the trial court was entitled to conclude that the Loving home was the defendant's home.

The appellate court also apparently believed, and the State explicitly argues, that the defendant could not claim the Loving home as his own because he fled there to escape the police. We reject this argument for two reasons. First, we do not agree that a suspect who flees to his own residence to escape capture thereby forfeits his right to claim that place as his home for *Payton* purposes. If that were true, the *Payton* guarantee would have no meaning, because the State could always claim

that a suspect who commits a crime and then returns home has "fled" there from the police. While it is true that flight and the possibility of flight have some bearing on the question of exigent circumstances, exigency is a separate question from the question of whether the suspect was arrested in his home.

We also reject this argument because it apparently rests on the mistaken factual premise that the defendant was staying with his mother up until the evening of August 23, and only "fled" to his brother's apartment when his mother told him that the police were looking for him. We have stated above why this premise is mistaken; the evidence clearly permitted the trial court to find that the defendant had been staying with the Lovings for seven days prior to August 23. In fact, since the defendant learned from his mother on August 22 that the police were looking for him, his decision to remain in the Loving residence despite this knowledge conflicts with the premise that he was "fleeing" from the police.

The only case cited by the State in support of its argument on this point, *United States v. Lang* (4th Cir. 1975), 527 F.2d 1264, is clearly distinguishable. In *Lang*, the defendant challenged the seizure of $300 obtained from an apartment where he was staying after he had committed a bank robbery. The defendant had paid the occupant of the apartment $300 to allow him to remain in the apartment while he was hiding from the police, and the occupant was clearly aware of the defendant's purpose. The court's opinion, which is extremely brief, contains no other facts. The court held that since the defendant was not "legitimately on the premises," he lacked standing to challenge the search of the apartment and the seizure of the physical evidence. (527 F.2d 1264, 1266.) *Lang* did not involve the question of the definition of a suspect's home for *Payton* purposes, but the very different, if perhaps analogous, question of whether a

defendant has standing to challenge the seizure of evidence from the place where he is arrested. Thus it is inapposite. Moreover, there is no showing in the instant case that Michael Loving was aware that the police were looking for the defendant.

Our conclusion is strengthened by the fact that in *People v. Yates* (1983), 98 Ill. 2d 502, we applied *Payton* to the arrest of a defendant who left his home one day after the crime for the home of a relative and was arrested at the relative's home three days later. Apparently assuming *Payton* was applicable, we held that exigent circumstances justified this at-home arrest. 98 Ill. 2d 502, 512, 515-17.

We therefore hold that, under the facts of this case, the trial court's finding that the defendant was arrested in his home was not manifestly erroneous. We now address the question of whether exigent circumstances were present to justify his warrantless arrest. We conclude that they were not.

In several prior cases this court has established general guidelines for the determination of exigent circumstances. The circumstances must "militate[ ] against delay and justif[y] the officers' decision to proceed without a warrant." (*People v. Abney* (1980), 81 Ill. 2d 159, 168-69.) In addition, the police officers must act in a "reasonable fashion." (81 Ill. 2d 159, 169.) The guiding principle is reasonableness, and each case must be decided on the basis of the facts presented (81 Ill. 2d 159, 173-74) and known to the officers at the time they acted. (*People v. Yates* (1983), 98 Ill. 2d 502, 515.) While no list of factors bearing on exigency can be considered exhaustive, we have in the past taken into account: (1) whether the offense under investigation has been recently committed (*People v. Abney* (1980), 81 Ill. 2d 159, 169); (2) whether there was any deliberate or unjustified delay by the officers during which time a warrant could have been ob-

tained (81 Ill. 2d 159, 170-71); (3) whether a grave offense is involved, particularly a crime of violence (*People v. Yates* (1983), 98 Ill. 2d 502, 515); (4) whether the suspect is reasonably believed to be armed (98 Ill. 2d 502, 515; see also *People v. Abney* (1980), 81 Ill. 2d 159, 171); (5) whether the police officers were acting upon a clear showing of probable cause (*People v. Yates* (1983), 98 Ill. 2d 502, 515; accord, *People v. Abney* (1980), 81 Ill. 2d 159, 171-72); (6) whether there is a likelihood that the suspect will escape if not swiftly apprehended (*People v. Yates* (1983), 98 Ill. 2d 502, 515); (7) whether there is strong reason to believe that the suspect is in the premises (98 Ill. 2d 502, 515); and (8) whether the police entry, though nonconsensual, is made peaceably (98 Ill. 2d 502, 515). All of these factors are guidelines, and not cardinal maxims to be applied rigidly in each case. (98 Ill. 2d 502, 515-16.) In this case, their application compels the conclusion that exigent circumstances were not present in this case.

Nearly two weeks elapsed between the commission of the murders, on August 12, and the arrest of the defendant, on August 23. The police learned immediately after the murders that the defendant was "involved." Detectives Antanocci and Jaglowski were assigned to the case on August 19, four days before the defendant's arrest. At any time prior to August 23, the police might have, but did not, seek a warrant for the defendant's arrest. Moreover, three days of the delay were attributable not to a continuing investigation but were instead caused by the happenstance that Antanocci and Jaglowski went off duty. The State's claim that the danger of flight or further violence precluded them from seeking a warrant is belied by the fact that they dropped the investigation for these three days without assigning it to any other officers.

The passage of time between the commission of the offense and the arrest has a significant bearing on claims of exigency. One study has shown that "nearly 50

percent of all arrests are made some time after the commission of the crime as the result of a 'hot' search of the crime scene or a 'warm' search of the general vicinity of the crime. *** [V]ery few additional arrests occur immediately thereafter. Rather there is a delay while further investigation is conducted; about 45 percent of all arrests occur more than a day after the crime, and nearly 35 percent of all arrests are made after the passage of a week." (2 W. LaFave, Search and Seizure 572-73 (2d ed. 1986), citing President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Science and Technology 96 (1967).) The lapse of time between the commission of the crime and the discovery of a suspect's whereabouts will make it much less likely that any additional " '[d]elay to obtain a warrant would have impeded a promising police investigation and conceivably provided the added time needed *** to avoid capture altogether.' " (*People v. Abney* (1980), 81 Ill. 2d 159, 170, quoting *United States v. Robinson* (D.C. Cir. 1976) (*en banc*), 533 F.2d 578, 583, *cert. denied* (1976), 424 U.S. 956, 47 L. Ed. 2d 362, 96 S. Ct. 1432.) In this case, the lapse of nearly two weeks between the commission of the crime and the discovery of the suspect's whereabouts rendered it extremely unlikely that an additional several hours of delay to obtain a warrant would have enabled the defendant to escape or permitted him to commit another serious crime.

Consideration of the second factor also militates against exigency. It is true, as the State argues, that the police did not engage in an unnecessary delay after speaking with Desiree White and learning that the defendant was residing with his brother. However, "unnecessary delay" is to be measured not from the time when police officers learn the suspect's location but from the time they obtain probable cause to arrest. Under *Payton*, "an arrest warrant founded on probable cause

implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." (*Payton v. New York* (1980), 445 U.S. 573, 603, 63 L. Ed. 2d 639, 661, 100 S. Ct. 1371, 1388.) In other words, under *Payton* the police need not obtain a search warrant to enter the defendant's residence if they possess an arrest warrant for the defendant and probable cause to believe the defendant is within the premises. (*United States v. Clifford* (8th Cir. 1981), 664 F.2d 1090, 1093.) Thus, the police entry in this case would have been justified by an arrest warrant secured any time after they received probable cause to arrest the defendant. While the record is not precise as to the date, the police seem to have received probable cause in the form of statements by eyewitnesses shortly after the killings on August 12. Detectives Antanocci and Jaglowski supposedly possessed probable cause at the outset of their investigation, on August 19. Moreover, after learning the address of Desiree White, and having reason to believe the defendant resided there, the two detectives dropped their investigation for three days instead of proceeding to obtain a warrant for the defendant's arrest. Thus, an unnecessary delay of at least three days, during which a warrant might have been obtained, preceded the defendant's warrantless arrest.

The considerations in favor of a finding of exigency are those related to the gravity of the crime, the possibility that the defendant was armed, and the further possibility that he might attempt to escape. In the proper case, we might well find these considerations decisive. Here, however, the behavior of the officers involved makes it impossible to believe that their failure to seek a warrant was in any way related to their perception of the danger of the situation. Not only did the officers fail to pursue the defendant for three crucial days, they also took the defendant to the stationhouse *without*

*placing him in handcuffs*, even though, according to Detective Jaglowski, the defendant had just attempted to elude arrest by fleeing through the rear porch.

In fact, in the appellate court, the State itself used the officers' failure to place the defendant in handcuffs to argue that the defendant had not been arrested, and had simply voluntarily accompanied the officers to the police station. Since the State does not reraise this argument in its brief here, there is no need to address the merits of this contention. However, this argument does illustrate the absurdity of any claim of exigency. It is simply not possible that the defendant was so dangerous that there was no time to seek a warrant for his arrest, but not so dangerous that there was no need to arrest him. Either of these two contentions might be plausible—but not both. The detectives may have, in fact, believed that the defendant was dangerous, but attempted to create the impression that he was not under arrest so as to later argue that statements the defendant might make were not the product of custodial interrogation. It is also possible that they did not, in fact, have probable cause to arrest the defendant, or not a strong enough showing of probable cause to risk seeking a warrant from a neutral magistrate. Regardless of their actual motivation, their deliberate acts in contravention of a claim of exigency supported the trial court's finding that no exigent circumstances justified their failure to seek and obtain a warrant.

We therefore hold that, under the unique circumstances of this case, the defendant's warrantless arrest was not justified by exigent circumstances.

The State next argues that the defendant's arrest was not violative of his fourth amendment rights because Michael Loving gave the officers consent to enter the apartment. It is true that voluntary consent to entry will justify a warrantless at-home arrest even in the ab-

sence of exigent circumstances. (*People v. Bean* (1981), 84 Ill. 2d 64, 69, *cert. denied* (1981) 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106.) Moreover, such consent need not be given by the defendant; it may instead be obtained from a third party. (84 Ill. 2d 64, 69; see also *United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993; *People v. Heflin* (1978), 71 Ill. 2d 525, 541.) However, the State has the burden of proving that the consent given was truly voluntary, and the voluntariness of that consent is a question of fact to be determined from a consideration of the totality of circumstances in a particular case. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059.) The totality of circumstances in this case supports the trial judge's finding that Michael Loving did not voluntarily consent to the police entry.

The State's argument on this point rests mainly upon the interpretation of the weight and credibility of the various witnesses to the officer's entry. The State argues, for example, that the trial court should have credited Detective Antanocci's testimony that the officers were "permitted" into the apartment. The State also argues that Loving "knew" the men at his front door were policemen because, when asked, he denied that the defendant was there.

We do not agree. Detective Antanocci's statement that the officers were "permitted" into the apartment was a statement of a legal conclusion rather than of a fact, and the trial judge was entitled to disregard it. The testimony of all of the witnesses established that Michael Loving opened the opaque door leading to the street only for his mother, not knowing that the officers were waiting to push past her and enter the hallway. Once the police officers had entered the hallway, Loving did not give them permission to go upstairs, and in fact pushed

past them to enter the apartment first. The fact that he knew that they were police officers after they entered does not compel the conclusion that he condoned their continued presence. Moreover, the trial judge was certainly entitled to conclude that Loving's denial that the defendant was present did not constitute a grant of permission for the police to enter. We therefore hold that the trial court's finding that the police did not have consent to enter was not manifestly erroneous.

Finally, the State argues that the defendant's statements need not have been suppressed because they were not the tainted "fruit" of his illegal arrest. We do not agree.

In general, evidence garnered by illegal means must be suppressed if the evidence has been obtained by exploitation of the initial illegality and not " 'by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun v. United States* (1963), 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.) In the case of a confession following an illegal arrest, the confession must be "sufficiently an act of free will to purge the primary taint of the unlawful invasion." (371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17.) Given the complexity of the workings of the human mind and the diverse possibilities of misconduct, factors bearing on the determination of whether a confession was obtained by exploitation of an illegal arrest include: (1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of official misconduct. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62; *People v. Franklin* (1987), 115 Ill. 2d 328, 333.) The burden of demonstrating attenuation between illegality and subsequent confession sufficient to render the confession admissible rests upon the prosecution. (*Brown v. Illinois*

(1975), 422 U.S. 590, 604, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2262.) In this case the trial judge did not manifestly err in finding that the prosecution failed to prove attenuation.

The State first argues that the voluntariness of the defendant's confession—as indicated by his receipt of *Miranda* warnings and the trial judge's finding that he had not been physically coerced—dissipates the taint of his illegal arrest. While the State is correct that the presence of *Miranda* warnings is one factor to be considered in determining attenuation, *Miranda* warnings, alone and *per se,* cannot dissipate the taint of an illegal arrest. (See *Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.) Indeed, satisfying the fifth amendment is only the threshold condition of the fourth amendment analysis required by *Brown,* for to admit automatically a voluntary confession obtained in violation of the fourth amendment would allow " 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.' " (*Dunaway v. New York* (1979), 442 U.S. 200, 219, 60 L. Ed. 2d 824, 840, 99 S. Ct. 2248, 2260.) Moreover, in *Dunaway* the court specifically rejected the argument that the absence of physical abuse or coercion in that case served to distinguish it from *Brown,* precisely the argument the State resurrects here. Therefore, the presence of *Miranda* warnings and absence of physical coercion in this case merely establishes the threshold requirement for admissibility.

The State next argues that the 24 or more hours between the defendant's warrantless arrest and his subsequent statement render it unlikely that the defendant's warrantless arrest was the "catalyst" which caused the defendant to incriminate himself. We do not agree. The temporal proximity between an arrest and a confession

is often an ambiguous factor, the significance of which will depend upon the particular circumstances of a particular case. Indeed, "[i]f there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one. Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister." (*Dunaway v. New York* (1979), 442 U.S. 200, 220, 60 L. Ed. 2d 824, 841, 99 S. Ct. 2248, 2260-61 (Stevens, J., concurring); see also *People v. Franklin* (1987), 115 Ill. 2d 328, 335-36.) Thus, where intervening circumstances are present, a long period between arrest and confession may support the inference that it was the intervening circumstance, and not the illegal arrest, which prompted the confession. However, where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess.

The State argues that there were two intervening circumstances present in this case. First, the State posits as an intervening circumstance the presence of a codefendant, Tony Baskin, in an interrogation room next to the defendant. The State infers that Baskin may have said or done something which prompted the defendant to confess. The record does not reveal when the defendant was made aware of Baskin's presence. The defendant himself stated that Baskin called out to him at some point and suggested that the defendant obtain a public defender. The State, however, argues that Baskin's presence at the police station, and the defendant's awareness of his presence, constitute intervening circumstances sufficient to dissipate the taint of the defendant's illegal arrest. We do not agree. While it is true that a defendant's confrontation with untainted evidence, which induces in the defendant a voluntary desire to confess, may be a legitimate intervening circumstance (see *People v. Gabbard* (1979), 78 Ill. 2d 88, 99 (defendant confronted with

sketch of robbery suspect prepared prior to his arrest and acknowledged the sketch resembled him); see also 4 W. LaFave, Search and Seizure 401 (2d ed. 1986)), Baskin's presence was hardly "evidence." Absent any suggestion that the defendant believed or knew that Baskin had implicated him in the crime, Baskin's presence was inherently ambiguous. Indeed, there is no evidence that Baskin said or did anything which would impel the defendant to confess. Given the State's burden of proving attenuation, Baskin's presence cannot, without more, constitute an intervening circumstance which will dissipate the taint of the defendant's lengthy and illegal detention.

The two appellate court cases cited by the State for authority on this point are distinguishable. In *In re R.S.* (1981), 93 Ill. App. 3d 941, 946-47, the defendant was confronted with a stolen clock seized pursuant to a valid search warrant unrelated to the defendant's illegal arrest. This was obviously untainted evidence capable of inducing a voluntary desire to confess. In *People v. Faulisi* (1977), 51 Ill. App. 3d 529, 534, the arrival of composite sketches of the defendants apparently induced their confessions. In both cases the untainted evidence was obviously inculpatory and immediately prompted a confession. Here Baskin's presence was not obviously inculpatory and appears to have played no part in inducing the defendant's confession.

The State's second argument for an intervening circumstance is based on the fact that the defendant's confession was given to different officers than those who illegally arrested him. The State notes that the interrogating officers were apparently unaware of the circumstances of the defendant's arrest. Therefore, the State argues, suppression of the defendant's confession would not serve the major purpose of the exclusionary rule, the deterrence of unlawful police conduct. Insofar

as we understand the State's argument, the State is urging us to hold that a confession need not be suppressed if given to an officer other than the one who illegally arrested the defendant, at least so long as the interrogating officer is unaware of the initial illegality.

We do not agree. Acceptance of the State's position would enable the police to violate the fourth amendment with impunity, simply by dividing the police into two units—one composed of officers who would make illegal arrests but who would not interrogate, and the other composed of officers who would interrogate but not arrest. With the addition of a Chinese wall of silence between the two units, the police could ensure that a confession derived from an illegal arrest need never be suppressed.

We do not believe that *People v. Gabbard* (1979), 78 Ill. 2d 88, compels such an absurd result. In *Gabbard,* it was held that a confession to a crime other than the one for which the defendant had been illegally arrested need not be suppressed as the fruit of an unlawful arrest. The arresting and interrogating officers belonged to different police forces. Neither the arresting officer nor the governmental entity by which he was employed was investigating, or responsible for investigating, the crime to which the defendant confessed. This court held that suppression of the confession would not serve the deterrent purpose of the exclusionary rule. (78 Ill. 2d 88, 98.) *Gabbard* is consistent with our position here. Very few officers would illegally arrest a suspect on the off chance that the officer for another police force, investigating a different crime, might later interrogate the suspect and obtain a confession. It is much more likely, however, that an officer would illegally arrest a suspect in the hope that an interrogating officer of the same force, investigating the same crime and conveniently left unaware of the illegality, might obtain the suspect's confession.

Moreover, in *Gabbard*, the connection between the arrest and the confession was also attenuated by the defendant's confrontation with a preexisting sketch of the man suspected of the robbery, an intervening circumstance not present here.

The State also argues that consideration of the purpose and flagrancy of police misconduct in this case would support its contention that the defendant's confession was not the product of his arrest. In support of this contention, the State first repeats its argument that the defendant was not mistreated while in custody. It also argues that the police conduct in apprehending the defendant was not "flagrant." It notes the fact that the officers did not batter down the doors of the Loving apartment, threaten its occupants, or misrepresent their reason for entering. The State also notes again the lack of handcuffs and draws the conclusion that "the arrest of the defendant was accomplished with all due respect for defendant's wishes."

The State's account of the defendant's arrest leaves out the police entry into the Loving home by subterfuge, and the drawing of guns at the entrance to the Loving children's bedroom. The State's account also conflicts with the argument that the failure to seek a warrant was justified by exigent circumstances. Given the long lapse between the time when the police obtained probable cause and the arrest of the defendant, the failure to seek a warrant and grant the defendant the protection of a neutral magistrate is itself flagrant. Moreover, the leniency of the police conduct towards the defendant may have been motivated by considerations other than "due respect for the defendant's wishes"—perhaps by the hope of a later finding that the defendant had not really been arrested. Particularly given the lack of any intervening circumstance which caused the defendant to confess, consideration of the purpose and flagrancy of

the police conduct in this case supports the trial court's conclusion that the defendant's confession should have been suppressed.

Lastly, the State argues that it is the place of the defendant's arrest which rendered that arrest illegal, and that the place of the defendant's arrest is not causally related to his confession. In other words, the State argues that the defendant would have confessed even if he had been arrested in a public place where no warrant was required. This argument lacks merit, for it would mean that *Payton* could only apply to physical evidence seized from a suspect's home, and never to confessions. Absent some indication from the Supreme Court of the United States that this position is correct, we decline to adopt it.

For the foregoing reasons, we reverse the judgment of the appellate court, affirm the order of the circuit court of Cook County, and remand this cause for further proceedings consistent with this opinion.

*Appellate court reversed;*
*circuit court affirmed;*
*cause remanded.*

JUSTICE SIMON, concurring:

I join fully in the well-reasoned majority opinion. My concurrence is addressed to the precipitate action of the appellate court in deciding the appeal without benefit of a brief from the defendant, the prevailing party in the trial court. As the majority states, the defendant's failure to file an appellate brief apparently resulted from a clerical error in the public defender's office. (117 Ill. 2d at 202.) The trial judge held, as we do today, that the defendant's arrest should be quashed and his statements suppressed. In these circumstances, the decision of the appellate court to resolve the appeal involving a defendant charged with murder who had no appellate representation at all was pointless.

The appellate court believed that consideration of the merits of the State's appeal was proper under the authority of *First Capitol Mortgage Corp. v. Talandis Corp.* (1976), 63 Ill. 2d 128. That case, however, involved the failure of a party to file a brief in a civil suit. The consequences of counsel's negligence in a criminal appeal are much harsher; while a negligent attorney in a civil case is liable for damages, "no attorney can restore his client's lost liberty." *People v. Brown* (1968), 39 Ill. 2d 307, 311.

In *Brown* this court observed that dismissal of a criminal defendant's appeal because of his lawyer's default in not filing a brief would be "repugnant to commonly held notions of justice and fair play." (39 Ill. 2d 307, 310; accord, *People v. Mims* (1980), 82 Ill. 2d 63; *People v. Aliwoli* (1975), 60 Ill. 2d 579.) Inscribed upon the Supreme Court building in Springfield is the imperative "audi alteram partem" which means "hear the other side." A reviewing court that decides an important question in a murder case without briefing or argument for the defendant ignores that directive.

Here, had the appellate court inquired about the status of the brief instead of ignoring the defendant when no brief was forthcoming, the clerical error in the defender's office would no doubt have been discovered and the brief would have been filed. No intentional disregard of the appellate court appears to have been involved here. Had the appellate court exhibited more patience, assisted by a defendant's brief it might have affirmed the circuit court and made it unnecessary for us now to be affirming the circuit court and reversing the appellate court. In any event, the appellate court should have withdrawn its opinion and set the case for briefing and argument when it was apprised of counsel's error.