THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BOLIVAR BENABE, Defendant-Appellant.

First District (3rd Division)   No. 1—87—0489

Opinion filed February 15, 1989.—Rehearing denied March 29, 1989.

Frederick F. Cohn, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Al Tomaso, and Robert B. Berlin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Bolivar Benabe, was charged with two counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)), two counts of attempted murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—4), two counts of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2), and three counts of aggravated battery (Ill. Rev. Stat. 1983, ch. 38, pars. 12—4(a), (b)(1), (b)(8)). Challenging the constitutionality of his warrantless arrest, he filed motions to suppress his confession. Following a hearing, the motions were denied. Defendant then was convicted of murder, attempted murder, and aggravated battery after a jury trial in the circuit court of Cook County, and he was sentenced to serve concurrent prison terms of 33 years for murder and 25 years for attempted murder. On appeal, defendant contends that his confession should have been suppressed because his warrantless arrest was not justified by any exigent circumstances which would have obviated the need for a warrant. He contends further that the pattern jury instruction on voluntary manslaughter incorrectly set forth the State's burden of proof and was prejudicially erroneous. Finally, he contends that the admission of hearsay evidence also was reversible error and was exacerbated by the State during closing arguments.

About 11 p.m. on August 24, 1985, Neal Summit was fatally shot and his brother-in-law, Donald Roedersheimer, was shot and wounded in an alley near Hamlin Park in Chicago, Illinois. Hamlin Park is located within two blocks of the Lathrop Homes, a public housing project where defendant lived with his mother at 2960 North Clybourn.

Roedersheimer testified at trial that he was a passenger in a

pickup truck being driven on Damen Avenue by Summit. When they turned onto Wellington, the truck was pelted with bricks and bottles. Summit then drove into Hamlin Park to try to escape because a car was blocking their way on Wellington. However, benches blocked their way in the park, and they then made a U-turn out of the park. Summit lost control of the truck when he was struck by an object hurled through his open window. Roedersheimer then noticed an individual riding a bicycle and told Summit, "[L]ook out, you are going to hit him." The rider managed to get off the bicycle in time but the truck hit the bicycle, which became attached to the front end of the truck. When Summit repeatedly shifted the truck backward and forward in order to dislodge the bicycle, the truck struck a car and tipped over. Summit then told Roedersheimer to jump out. Roedersheimer started to run, but Summit called him back and threw a bag of tools and clothing to him. They then ran down the street and into a dark alley. About two blocks into the alley, Roedersheimer heard a "flurry of shots, like the Fourth of July," and was struck by at least two bullets. He did not see Summit. Finally, Roedersheimer denied that he was a member of a street gang.

Richard Selover happened to be sitting in a parked car near 2231 West Wellington at the time of the crime. He testified at trial that he saw the victims' truck proceeding the wrong way down Wellington, which was a one-way, eastbound street. At that time no one was chasing the truck, which was dragging a bicycle. The driver of the truck then backed up, dislodging the bicycle, before he turned, hit a car, and the truck tipped over. Two occupants emerged from the truck and ran down the alley. Selover testified that three persons, one of whom was on a bicycle, chased the victims down the alley. Selover testified further that the individual on the bicycle appeared to have "a weapon, like a gun or something" in one of his hands. The other hand was on the bicycle. Selover did not actually see a gun. When the individual on the bicycle turned into the alley, he left the bicycle in an empty lot. Another individual who was running appeared to have a bag which was shaped like a gun. About a minute later Selover heard at least four gunshots and saw everyone scatter. He was unable to recognize any of the persons involved.

About 11 p.m. Chicago police detectives O'Brien and Cole responded to a report concerning the shootings. O'Brien testified that he found Roedersheimer leaning against a tree and Summit lying on the ground. An open folding knife was recovered near Summit's body. O'Brien indicated that the alley where the shootings occurred was very long, extending from Wellington to Barry with no intersecting al-

ley. A bicycle was found at the mouth of the alley near the pickup truck.

About 9:30 or 10 a.m. on August 26, 1985, Chicago police detective O'Leary was assigned to investigate the shootings, and he spoke to Danny Greco at that time. The trial court sustained defense counsel's objections to the State's questions as to whether Greco supplied O'Leary with the alleged offender's nickname. After speaking to Greco, O'Leary consulted Chicago police detective Brennann, who specialized in gang crimes.

Brennann testified that he was assigned to assist in the investigation about 11 a.m. O'Leary asked him to check a nickname in the gang file. Brennann then looked up the nickname "Little Jap" in the file on the Insane Deuces street gang but did not find any information. After Greco supplied further information, Brennann and O'Leary, along with three other officers, O'Quinn, Martinez, and Thiel, went to defendant's home at 2960 North Clybourn. We will describe the events at defendant's home in connection with our discussion of the motion to suppress. For the present, however, it is sufficient to note only that defendant was taken to the police station at Belmont and Western, where he eventually supplied a written confession to Assistant State's Attorney Michael J. Kelly, who testified at trial concerning defendant's confession. Defendant told Kelly that he was a member of the Deuces gang, which was feuding with a rival gang called the Simon City Royals. He and Danny Greco were drinking scotch with friends in Hamlin Park when defendant saw a pickup truck speeding toward them. Defendant claimed that the two occupants in the truck indicated that they were members of the Royals. As the truck drove away, defendant stated, "Deuce love." The truck then swerved as if to hit a couple crossing the street, and then drove onto the baseball diamond. Defendant rode a bicycle to the parking lot of the Lathrop housing project to summon help from the Kings, who were allies of the Deuces. However, defendant told Kelly that when he reached the parking lot, only some girls were there. He then cut through the parking lot to get a small pistol from the gang's "stash." The pistol he wanted was missing so he "grabbed" a .38 caliber revolver instead.

Defendant then returned to the park and saw Danny Greco throwing a bottle at the truck. Defendant asked where the occupants were, and Danny Greco replied that they were in the alley. When defendant turned the corner, he noticed the overturned truck in the middle of the street. Defendant "peeked" down the alley to see how far away the occupants were. With the gun in his hand, defendant told Danny

Greco, "[L]et's get these motherfuckers," and they ran down the alley, intending only to "scare them off." Defendant saw the victims slow down and straighten their clothes in preparation to walk out of the alley. Defendant was 10 feet away when he said, "[H]ey." When one of the victims turned around, defendant saw him flash a "shiny thing" in his hand. Defendant then "just quickly got up the gun and pow, pow, pow, kept shooting." Defendant stated that he shot "without hesitation" and admitted that he fired up to five times. He then saw one of the victims fall. After defendant froze momentarily, he ran away. When he reached the housing project, he threw the gun on the floor. He did not throw it away because he "figured" that his fingerprints were "all over it." Another member of defendant's gang picked up the gun. Defendant indicated that he was giving the statement because "it's the truth."

At trial, defendant testified that he was pressured into making the confession, that Kelly told him what to say, and that he was not the gunman. He denied that he had a gun and claimed instead that an unknown individual jumped out of a gangway into the alley and fired the gunshots at the victims.

During rebuttal by the State, Kelly testified that he did not suggest what defendant should say in the confession.

The trial court gave the jury a number of instructions, including a modified pattern murder instruction and the following modified pattern voluntary manslaughter instruction:

> "To sustain the charge of voluntary manslaughter, the State must prove the following propositions:
>
> *First*: That the defendant performed the acts which caused the death of Neal Summit; and
>
> *Second*: That when the defendant did so, he intended to kill or do great bodily harm to Neal Summit; or he knew that his acts would cause death or great bodily harm to Neal Summit; or he knew that his acts created a strong probability of death or great bodily harm to Neal Summit; and
>
> *Third*: That when the defendant did so he believed that circumstances existed which would have justified killing Neal Summit; and
>
> *Fourth*: That the defendant's belief that such circumstances existed was unreasonable.
>
> *Fifth*: That the defendant was not justified in using the force which he used.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a rea-

sonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

See Illinois Pattern Jury Instructions, Criminal, No. 7.06 (2d ed. 1981) (Issues in Voluntary Manslaughter—Intentional—Belief of Justification). The record discloses that there was no objection to the above instruction. On appeal, however, citing *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, defendant contends that the above instruction was prejudicially erroneous because it incorrectly set forth the State's burden of proof. Defendant contends that the jury should have been instructed that the State was required to prove beyond a reasonable doubt that defendant did not believe that circumstances existed which would have justified killing Neal Summit. We agree that the two paragraphs of the above instruction which are prefaced with the words *"Third"* and *"Fourth"* are improper.

■ In *People v. Reddick* (1988), 123 Ill. 2d 184, 197, the Illinois Supreme Court ruled that the burden is upon the State to disprove the mitigating mental condition for voluntary manslaughter of unreasonable belief in justification:

"The burden-of-proof instructions regarding both voluntary manslaughter and murder in both of these cases were thus incorrect in placing upon the People the burden of proving the existence of intense passion or unreasonable belief in justification. The instructions should have placed upon the People the burden of disproving the existence of either of these two states of mind."

Application of *Reddick* to the instruction here would require that the paragraph beginning with the word *"Fourth"* be deleted and that the immediately preceding paragraph be revised to state as follows:

"*Third*: That when the defendant did so he did not believe that circumstances existed which would have justified killing Neal Summit."

■ Although the State contends that the *Reddick* decision should be given prospective effect only, we recently ruled that *Reddick* applies retroactively to pending proceedings because the pattern jury instructions for murder and voluntary manslaughter "failed to correctly set the State's burden of proof and constituted grave, nonwaivable error." (*People v. Flowers* (1989), 192 Ill. App. 3d 292, 296; *People v. Brooks* (1988), 175 Ill. App. 3d 136, 142, 529 N.E.2d 732.) Therefore, the failure to apprise the jury of the State's correct burden of proof was reversible error. The error was not

harmless given defendant's statement that he saw the victim flash a shiny object in his hand and given the fact that a knife was found near the victim's body. (*Cf. People v. Carter* (1988), 177 Ill. App. 3d 593.) However, given the facts in the instant case, a jury could reasonably find beyond a reasonable doubt that defendant did not believe he was acting in self-defense. Because a jury could find beyond a reasonable doubt that defendant did not act in the belief that he was defending himself, defendant is entitled at this point to a new trial but not an acquittal. (See *People v. Reddick* (1988), 123 Ill. 2d 184, 201.) We note further that the double jeopardy clause does not preclude defendant's retrial because the reversal is based upon trial error. See *Lockhart v. Nelson* (1988), 488 U.S. \_\_\_, 102 L. Ed. 2d 265, 109 S. Ct. 285.

Next, it is undisputed that the police officers did not obtain a warrant for defendant's arrest. Defendant contends that the trial court erroneously denied his motion to suppress because no exigent circumstances justified the absence of a warrant. The evidence was conflicting at the suppression hearing. Chicago police detective Thiel testified that he was assigned to the case at 9 a.m. on August 26, 1985. About 10:30 that morning, he spoke to Danny Greco, who told him that defendant fired a gun at the victims near the mouth of the alley. About 1:30 p.m. Thiel, O'Leary, and three other officers went to 2960 North Clybourn. According to Thiel, they knocked on the door and a male voice asked who was there. Thiel testified that they responded, "[P]olice," and that defendant then opened the door. When the officers told defendant that they wanted to discuss the case with him, he told them not to stand in the hallway and to come inside. He then agreed to accompany them to the police station. Thiel denied that defendant was sleeping when they arrived, and denied further that they had to walk up any stairs. Although they did not handcuff defendant at that time or tell him that he was under arrest, defendant was not free to leave. When defendant's sister yelled and pushed Thiel, she was arrested. The officers then transported defendant and his sister to the police station at Belmont and Western. Thiel initially testified that they arrived at the station about 1 p.m. but subsequently changed his response twice, to 2:30 and to between 2 and 2:30.

Defendant testified that he was sleeping at 9 a.m. on August 26, 1985, and was awakened about 10 a.m. by a scream. He recognized Brennann and asked what he was doing there. Brennann responded, "[L]et's go, let's go. You're under arrest." Defendant asked whether they had a warrant, and Brennann answered that they did not.

Defendant asked Brennann how they had gained entrance, and Brennann said that defendant's mother had let them enter. When defendant asked his mother whether that was true, she denied that she had let them inside. They arrived at the police station around 10:30 a.m. Defendant testified that he had no personal knowledge of what happened when the police officers were at his front door, but he admitted that their guns were not drawn, that they did not strike him, and that they did not handcuff him. He cooperated with them.

Defendant's mother (Carmen Benabe), sister (Dolia or Dahlia Colon), and next-door neighbor (Rosemary Robetaille) all corroborated that the officers were at defendant's home about 9:30 a.m. The neighbor testified further that the police officers knocked once and let themselves inside the unlocked doors without waiting for an answer. She admitted that the police neither drew their guns nor kicked down the doors. She claimed that both defendant and his sister were handcuffed when the officers escorted them out of the apartment about 10 a.m.

Defendant's mother testified through an interpreter that defendant was sleeping when the police arrived about 9:30 a.m. She testified that she heard a ring, not a knock on the door, and that the police opened the door themselves. She called to her daughter to speak to them because, despite having lived in this country for 26 years, she allegedly spoke no English. She denied that she said anything to the police. She indicated that defendant was not handcuffed.

Defendant's sister testified that she asked one of the police officers whether he had a warrant and that he replied that he did not need one. She conceded that their guns were not drawn and that she did not see them strike defendant. She stated that defendant was not handcuffed.

The State presented several rebuttal witnesses. Chicago police officer Martinez initially indicated that he was at defendant's home with the other officers at 1:30 p.m., but subsequently stated that he arrived there during the morning. They knocked on the door and rang the doorbell several times. They then noticed a woman by the window and identified themselves as police officers. She motioned with her hand, and Martinez believed that she said in English, "[C]ome on up." He admitted, however, that he was not sure of what she said. The door was unlocked and they entered and went upstairs. When Martinez told her in Spanish that they wanted to speak to defendant, she pointed to a bedroom and said that he was sleeping. Finally, Martinez testified that Brennann allowed defendant to use the washroom.

Brennann testified that five police officers in two cars went to defendant's apartment. He was at defendant's home with O'Quinn and Martinez at 1:30 p.m. One of them knocked on the door. After a moment, someone rang the doorbell. A woman appeared at a window, motioned for them to come upstairs, and said, "[C]ome up." He admitted, however, that he was not sure of the words, although Brennann believed that she spoke in English. The officers then went inside. They walked upstairs, where Martinez spoke to the woman. She hollered defendant's name, and Brennann looked in an open bedroom door and saw defendant sitting on the bed. Brennann stated, "[C]an you come with us? There was a problem in the park the other night with that guy with the truck," and defendant answered, "[O]kay." While defendant dressed and used the washroom, Brennann heard the commotion involving defendant's sister. Defendant was not handcuffed when they transported him to the police station five blocks away at Belmont and Western.

O'Leary testified that he, Thiel, O'Quinn, Martinez and Brennann went to defendant's home around 1:30 p.m. They rang the bell and knocked on the door. When a woman appeared at the window on the second floor, they identified themselves as police officers, and she said "[C]ome on up." They went upstairs where they saw her again. Brennann asked her whether defendant was home and she called defendant's name. She and Brennann then went to the other room and emerged with defendant. When they left the apartment about 2 p.m., defendant was not handcuffed.

It is undisputed that the police officers did not obtain a warrant for defendant's arrest. Defendant contends that the warrantless arrest was unconstitutional and required suppression of his subsequent statements, including his confession. The only issue on appeal is whether exigent circumstances excused the officers' failure to obtain a warrant. We hold that it was not manifestly erroneous for the trial court to find that exigent circumstances existed under the totality of the circumstances.

■■ ■ A trial court's finding on a motion to suppress evidence will not be disturbed unless it is manifestly erroneous. (*People v. Long* (1983), 99 Ill. 2d 219, 231, 457 N.E.2d 1252; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.) In the absence of exigent circumstances, the police may not enter a suspect's home to arrest him without a warrant for his arrest and reason to believe that he is within. (*Payton v. New York* (1980), 445 U.S. 573, 574-75, 590, 602-03, 63 L. Ed. 2d 639, 643-44, 653, 660-61, 100 S. Ct. 1371, 1374, 1382, 1388; *People v. White* (1987), 117 Ill. 2d 194, 209, 512 N.E.2d 677,

*cert. denied* (1988), 485 U.S. 1006, 99 L. Ed. 2d 698, 108 S. Ct. 1469.) Reasonableness is the guiding principle in determining whether exigent circumstances existed to justify a warrantless arrest. (*People v. White* (1987), 117 Ill. 2d 194, 216.) Factors to be considered are (1) whether the crime was recently committed, (2) whether there was deliberate or unjustified delay by the police officers during which time they could have procured a warrant, (3) whether a grave offense is involved, particularly a crime of violence, (4) whether the police officers reasonably believed that the suspect was armed, (5) whether the police officers were acting upon a clear showing of probable cause, (6) whether there was a likelihood that the suspect would escape if not quickly captured, (7) whether there was strong reason to believe that the suspect was on the premises, and (8) whether the entry by the police officers was peaceful. (*People v. White* (1987), 117 Ill. 2d 194, 216-17.) The above factors are to be treated as "guidelines" and not as "cardinal maxims." *People v. White* (1987), 117 Ill. 2d 194, 217.

■ In the case at bar, we are satisfied that the requisite exigent circumstances existed. With respect to the first and second of the above factors, the crime was committed about 11 p.m. on August 24, 1985. Defendant was arrested on August 26, 1985. Although the evidence was conflicting as to the exact time that the officers went to defendant's home on August 26, 1985, we note that their testimony at the suppression hearing was given about one year after the arrest. Furthermore, it is apparent that they went to defendant's home shortly after Danny Greco supplied them with information that incriminated defendant. Given these circumstances, we do not believe that there was a deliberate or unjustified delay on the part of the police officers. Next, a grave and violent offense was involved, the fatal shooting of Summit and the wounding of Roedersheimer, and the police officers reasonably could have believed that defendant, a street gang member incriminated in the shootings, was armed. Although defendant contends that the officers' failure to handcuff him belied their belief that he was dangerous or a flight risk, we believe that the totality of the circumstances demonstrates the existence of exigent circumstances at the time of the arrest. Furthermore, the officers were acting upon a clear showing of probable cause, despite defendant's contention that Greco lacked sufficient credibility to provide probable cause for defendant's arrest. Defendant and Greco were members of the same street gang and the investigation was of a gang-related crime. The officers would have a strong reason to believe that defendant would be on the premises at 2960 North Clybourn because he lived there. Finally, it was undisputed that the offi-

cers neither drew their guns nor broke down the doors and that their entry was peaceful. Given these circumstances, the trial court's denial of defendant's motion to suppress did not contravene the manifest weight of the evidence.

Finally, because this matter is being remanded for a new trial, we need not address defendant's contention that there were prejudicially erroneous violations of the hearsay rule.

The judgment of the circuit court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

McNAMARA and WHITE, JJ., concur.