FOURTH DIVISION
June 30, 2006

No. 1-04-2019

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | |
| v. | No. 00 CR 26257 |
| LARRY SCOTT, | Honorable Thomas R. Sumner, |
| Defendant-Appellant. | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court

Defendant Larry Scott appeals from his convictions for first degree murder and armed robbery and his sentencing to two consecutive terms of 30 years and 7 years, respectively. For the reasons that follow, we reverse and remand for new trial.

Prior to trial, defendant filed a motion to quash his arrest on murder and armed robbery charges and suppress statements he had made to police. On October 2, 2000, defendant was arrested for retail theft and detained at the Chicago Ridge police station. He was later released on bond, and as he was leaving the station, two homicide detectives placed him in custody and transported him to Area Two police headquarters. Defendant stated that the detectives never showed him an arrest warrant and detained him for several hours at police headquarters, where he made statements to officers regarding the murder of Jesus Villalobos.

Detective Steve Brownfield testified that he had been assigned to investigate Villalobos' murder in August 2000, and that a police informant had implicated defendant in the crime. Brownfield showed a photograph of defendant to one of Villalobos' neighbors, who stated that defendant had been in the area near

Villalobos' home the week of his murder. On that basis, Brownfield issued a stop order on defendant. Brownfield never spoke directly with the informant or the officer who had received the tip that defendant was involved in the murder.

Sergeant Edward Nicol testified that on August 14, 2000, an informant that he had known for three years contacted him and informed him that defendant had murdered Villalobos. Nicol had received tips from the informant on several prior occasions while investigating narcotics activity, the information he received was always very detailed, and he had executed between 15 and 20 arrests based on his communications with the informant. Nicol stated that the knowledge he acquired through the informant was always reliable and that he had never paid the informant or coerced information from him.

The circuit court granted defendant's motion on the basis of a lack of probable cause, stating that a prudent officer provided with the informant's statement would not have believed that defendant committed the murder.

The State then filed a motion for attenuation. At the hearing, Detective John Fassi testified that he and his partner, Detective Al Almazan, arrested defendant at the Chicago Ridge police station on the night of October 2, 2000, and drove him to Area Two, where Fassi placed defendant in an interview room. Fassi read defendant his Miranda rights and questioned him as to the murder of Villalobos. Defendant related that he knew Villalobos but denied any involvement in his murder.

The following morning, Fassi again read defendant his rights and spoke with him about the murder. Defendant denied any involvement, but submitted to a buccal swab and a polygraph examination. Fassi spoke with defendant on two subsequent occasions that day, each time reminding him of his Miranda rights, during which defendant maintained his denials of involvement in the murder, but was willing to discuss his heroin addiction and other aspects of his personal life.

Detective Fassl further stated that the next evening he and Detective Almazan transported defendant to Villalobos' apartment, where the victim's body had been found. Once they entered the apartment, defendant became visibly upset when he saw dried blood on the kitchen floor. Defendant asked to speak to Fassl alone and proceeded to make an admission. The detectives transported defendant back to police headquarters, where he spoke with Assistant State's Attorney (ASA) James Papa and gave a videotaped statement in which he admitted stabbing Villalobos and taking money from his apartment. Fassl further testified that, during his conversations with him, defendant never complained of the effects of heroin withdrawal, and that he never accused defendant of committing the murder and never conveyed that eyewitnesses had identified him. However, Fassl did admit that it was his objective in speaking with defendant to obtain a confession, which defendant proffered 46 hours after his arrest.

Detective Brownfield testified that during questioning defendant did not appear to be in distress nor did he request medical attention, nor was defendant offered anything in exchange for his statement. ASA Papa testified that he advised defendant of his office, reminded defendant of his Miranda rights, and spoke with defendant for nearly an hour. Defendant admitted killing Villalobos and stated that he had not been mistreated while in police custody.

The circuit court granted the State's motion, finding sufficient attenuation in the multiple Miranda warnings the police had issued to defendant, the proper treatment defendant was shown while in custody, and the intervening circumstance of the visit to Villalobos' apartment.

Defendant then sought to suppress his statements to police and Papa, arguing that they were given involuntarily. Defendant testified that when Detectives Fassl and Alamazan took him into custody, he requested a lawyer but was never allowed to speak to one. He also stated

3

that Fassl showed him photos of Villalobos' autopsy and told him, "This is your work."

Defendant explained to the detectives that he was a heroin addict and experiencing withdrawal symptoms, and asked to see a doctor. Defendant was left alone for long periods of time and not allowed to use the bathroom, despite repeated requests. As a result he vomited and urinated on the floor of the interview room. Defendant complained of nausea, back pain, and a painful abscess on his foot. In response to defendant's complaints, Fassl indicated that a statement regarding the murder could be exchanged for medical attention. Defendant could not think of anything to say to Fassl's satisfaction. Fassl transported him to Villalobos' apartment, where he and other detectives accused him of killing Villalobos. Defendant agreed to give a statement in return for medical attention. Fassl reduced defendant's statement to writing, and defendant gave the statement on videotape, but he did not inform ASA Papa that he had agreed to give the statement in exchange for medical treatment.

On cross-examination, defendant admitted that he had filed two previous motions to suppress, neither of which contained allegations of heroin addiction or withdrawal influencing his decision to offer a statement as to Villalobos' murder. Defendant also admitted that in his videotaped statement, he stated had been treated well by the detectives and by ASA Papa, that he was giving the statement freely and voluntarily, that he had not been threatened or promised anything in return for giving the statement, and that at no time during the statement did he complain of the effects of heroin withdrawal or the denial of medical treatment.

On redirect, defendant asserted that he did mention his heroin addiction and withdrawal symptoms to the polygraph examiner and to medical personnel at the Cook County jail.

Defendant called Barry Hargan, whom the trial court accepted as an expert qualified to

testify on addictive disorders. Hargan testified that, based on interviews with defendant, his videotaped statement, and a review of his medical history, defendant was a heroin addict in 2000 and that he had been treated with Routine-A, a medication prescribed to treat heroin withdrawal, soon after his arrest, and that defendant was likely experiencing withdrawal symptoms at the time of his interviews with the detectives. On cross-examination, Hargan admitted that he never spoke with anyone else who had been present when defendant gave his videotaped statement, that he never spoke with any doctors or other medical personnel who had attended to defendant, and that defendant appeared composed and did not appear to be undergoing the effects of heroin withdrawal in the statement.

The circuit court initially granted defendant's motion to suppress. The State filed a motion to reconsider, reminding the court that, following the attentuation hearing, Detective Fassl had been found to be a credible witness and that defendant did not appear to be under any distress or to have suffered any mistreatment in his videotaped statement. The prosecutor also argued that there was no evidence to corroborate defendant's allegations of the withdrawal symptoms he experienced while in custody. Noting that the defendant's demeanor during the statement appeared composed and relaxed and that there was no substantial evidence to corroborate defendant's claims of withdrawal, the circuit court granted the State's motion to reconsider and denied defendant's motion to suppress.

At jury trial, Villalobos' neighbor Estella Gonzalez testified that she last saw Villalobos on the evening of August 2, 2000. She went to call on Villalobos the following afternoon and noticed that the front door to his apartment was open. She entered and found Villalobos on the floor. She called another neighbor, Roberto Salazar, for help. Salazar discovered that Villalobos

was dead and called 9-1-1.

Chicago police forensic investigator John Paulson testified that he processed the scene of Villalobos' murder on August 3, 2000. He photographed the entire scene and recovered several items including an ashtray and two knives, one of which appeared to have red stains on it. He found the knife on top of a television set in a bedroom and noted that it had a figure resembling a dog carved in the handle. No discernible fingerprints were recovered.

Officer Larry Thomas testified that on August 14, 2000, he received a page from a confidential informant whom he had previously consulted in narcotics investigations. After meeting with the informant, Thomas and his partner sought the whereabouts of defendant to question him about Villalobos' murder and related the information to Detectives Fassl and Almazan.

Detective Fassl testified to the same facts he asserted in prior hearings. He further stated that when he accompanied defendant to Villalobos' apartment, defendant related that he and Villalobos would often arrange to shoplift clothing and sell it in order to finance their heroin habits. Prior to August 3, 2000, Villalobos asked defendant to obtain six pairs of children's jeans for which he would pay defendant $60. Defendant went to Villalobos' apartment that morning to drop off the jeans, but Villalobos no longer wanted them. Defendant became angry, grabbed a knife he found in the kitchen, and proceeded to stab Villalobos in the chest. Defendant described the knife as having an animal figure carved into the handle. Villalobos fell backwards onto a chair and then onto the floor and began to yell for help. To silence him, defendant stabbed him twice more. Once Villalobos was silent, defendant went into a bedroom and took a stack of money (approximately $950) he found inside, then went into another bedroom and set the knife

6

down on top of a television set.

Defendant related that, following the incident, he left Villalobos' apartment through the front door and purchased heroin from two different sellers using the money he had stolen. Later, again using the money had taken from Villalobos' apartment, defendant purchased a train ticket to Alabama in order to attend a flea market and purchase firearms, which he intended to resell in Chicago. When he arrived in Alabama, defendant was unable to obtain the guns and returned to Chicago the evening of August 5, 2000.

After finishing the conversation with defendant, Detectives Fassl and Almazan transported defendant back to police headquarters and contacted ASA Papa, who obtained defendant's consent to proffer a videotaped statement describing his involvement in Villalobos' murder.

On cross-examination, Detective Fassl admitted that it was his goal to elicit a confession from defendant and that he was aware at the time of the investigation that there was no physical evidence or eyewitness accounts implicating defendant in Villalobos' murder. He stated that transporting defendant to the murder scene was an interview technique that he hoped would provoke defendant to confess and that he did not walk defendant through the apartment telling him what he had done.

Detective Brownfield testified that after defendant offered the statement, he corroborated defendant's purported movements after the murder by contacting the carriers on which defendant claimed to have travelled. Cook County assistant medical examiner Dr. Nancy Jones testified that she had performed the autopsy on Villalobos' body and opined that the cause of death was multiple stab wounds that could have been caused by the knife recovered from his apartment.

7

The parties stipulated that no DNA samples retrieved from Villalobos' apartment matched that of defendant. The parties also stipulated that representatives from Amtrak and U.S. Airways would testify that defendant purchased tickets for travel from Chicago to Alabama and back on August 3 and 5, 2000. ASA Papa recounted the testimony he had given at the suppression hearing. The State also presented defendant's videotaped statement.

Defendant called Hargan, who again was accepted as an expert qualified to testify on addictive disorders, and he recounted the testimony he had given at the suppression hearing. On cross-examination, Hargan admitted that he never spoke with anyone else who had been present when defendant gave his statements and that defendant appeared composed and did not appear to be experiencing the effects of heroin withdrawal in the statement.

Dr. Ghassan Zalzaleh testified that he had examined defendant at Cermak Hospital on October 6, 2000, and that although defendant appeared pale, his eyes and heart rate appeared normal, and he did not exhibit the physical symptoms of heroin withdrawal, even though defendant informed him that he was addicted to heroin. Zalzaleh prescribed a topical antibiotic for an infection on his foot and Routine-A to alleviate the effects of heroin withdrawal.

Defendant testified on his own behalf that he did not kill Villalobos and was not present when the murder took place. He further testified that he had been addicted to heroin and had last used the drug soon before his arrest in October 2000. He stated that he was experiencing symptoms of withdrawal during his interview with Detective Fassl, that he explained as much to Fassl and requested treatment. He experienced withdrawal the entire night following his arrest, at several times vomiting and urinating on the floor of the interview room and not being able to sleep. Defendant further stated that when Fassl took him to Villalobos' apartment, Fassl narrated

8

what had happened to Villalobos, and defendant verbally agreed only because he needed treatment for his withdrawal symptoms. He also stated that the videotaped statement he gave to ASA Papa was concocted with Fassl's help.

On cross-examination, defendant conceded that Detective Fassl did not tell him to provide all the details of his statement regarding the murder and that he did not discuss his heroin withdrawal when speaking with ASA Papa.

In rebuttal, the State called Detective Fassl and ASA Papa. Fassl stated that defendant never complained of heroin withdrawal or any other ailments while he was in questioning and that he never coerced or otherwise gave defendant any incentive to confess to Villalobos' murder. Papa stated that during his interview, defendant did not appear to be ill or in any pain or discomfort.

After deliberating for approximately four hours, the jury sent a note to the trial judge stating that it could not reach a unanimous decision and seeking advice on how to proceed. With the consent of the parties, the court advised the jury to keep deliberating. The jury later informed the court that it was still deadlocked, so the court ordered that it be sequestered over night. The following morning, the jury sent another note stating that it was still deadlocked. The prosecutor asked the court to inquire whether the jury had made any progress and proposed an instruction regarding the necessity for unanimity, in accordance with People v. Prim, 53 Ill. 2d 62 (1972). The defense indicated its agreement to such an instruction would hinge on the jury's answer as to whether it had made any movement.

The jury foreperson indicated that there had been some progress made, and the trial judge advised that the jury continue to deliberate until it reached a verdict. The jury eventually

returned guilty verdicts, and the circuit court sentenced defendant to prison terms of 30 years for first degree murder and 7 years for armed robbery, to be served consecutively, and ordered him to submit a DNA profile.  Defendant now appeals.

Defendant initially argues that his fourth amendment rights were violated when the circuit court, despite ruling that his arrest for the murder of Villalobos was unlawful, held that the inculpatory statements he made to detectives and ASA Papa were not the product of the illegal arrest.  The State counters that the confrontation of defendant with the crime scene served as a sufficiently intervening circumstance to purge the taint of the unlawful arrest and render defendant's statements admissible.

Traditionally, when the disposition of a suppression motion turns on factual determinations and credibility assessments, Illinois courts would only overturn such a decision where it was manifestly erroneous.  People v. Bunch, 207 Ill. 2d 7, 13 (2003).  Conversely, where the facts and witness credibility as to an officer's discovery of evidence were not in dispute, courts would review a decision on a motion to suppress *de novo*.  People v. Wilberton, 348 Ill. App. 3d 82, 85 (2004).  However, the Illinois Supreme Court has held that reviewing courts are free to undertake their own assessments of the facts in relation to the issues presented and may draw their own conclusions when deciding what relief should be granted.  Accordingly, reviewing courts consider *de novo* the ultimate question of whether evidence should have been suppressed.  People v. Pitman, 211 Ill. 2d 502, 512 (2004).

A court's determination that a defendant was unlawfully arrested is not dispositive of the admissibility of a confession subsequently offered.  People v. Bates, 218 Ill. App. 3d 288, 297 (1991).  Admissibility hinges on whether the confession was obtained by exploitation of the

illegal arrest, and such a confession may be admissible if it was obtained by means sufficiently distinguishable from the arrest so as to be purged of the primary taint. Bates, 218 Ill. App. 3d at 297-98; Wong Sun v. United States, 371 U.S. 471, 486-87, 9. L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17 (1963). In order to prove that a confession was sufficiently attenuated so as to be admissible, the State must show by clear and convincing evidence that the statement was a product of the defendant's free will and independent of the taint of the illegal arrest. People v. Berry, 314 Ill. App. 3d 1, 15 (2000). In assessing the admissibility of a statement given in the wake of an illegal arrest, courts consider: (1) the proximity in time between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of police misconduct; and (4) whether the defendant received Miranda warnings. People v. Tingle, 279 Ill. App. 3d 706, 714 (1996); Brown v. Illinois, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975). Intervening circumstances and police misconduct are considered the key factors in attenuation analysis. People v. Wilberton, 348 Ill. App. 3d 82, 85 (2004).

Initially, we note that defendant was apprised of his Miranda rights on multiple occasions, several hours and immediately prior to the times he gave his statements to Detective Fassl and ASA Papa. While such a fact is not sufficient to purge defendant's statements of the taint of his unlawful arrest (see People v. Foskey, 136 Ill. 2d 66, 86 (1990)), this factor obviously weighs in favor of a finding of attenuation.

We next consider the length of time that elapsed between defendant's admittedly unlawful arrest and the time he offered his initial statement to Detective Fassl. From the testimony elicited at the attenuation hearing and at trial, it is apparent that approximately 48

11

hours elapsed between the time that Fassl took defendant into custody and the time that defendant admitted killing Villalobos after viewing the crime scene. Defendant agreed to make the videotaped statement to ASA Papa a few hours after tendering the initial confession to Fassl.

A lapse of time between an illegal arrest and a subsequent confession may dissipate the taint of the unlawful arrest in that it allows the defendant to reflect on his situation and the possible existence of evidence implicating him in the offense. Wilberton, 348 Ill. App. 3d at 86. However, the mere passage of time during a prolonged detention is insufficient to purge the taint of an illegal arrest, and at best may be an ambiguous indicator as to a confession's admissibility, and at worst a serious exploitation of the preceding arrest. People v. Vega, 250 Ill. App. 3d 106, 117 (1993).

Here, while defendant was detained for quite a length of time, he was not interrogated incessantly, giving him plenty of opportunity to ponder his situation. However, the length of his detention could also militate against a finding of admissibility. Accordingly, this factor is at best ambiguous and does not appear to favor either admissibility or suppression.

We next examine the presence of any intervening circumstances. " 'An intervening circumstance is one that dissipates the taint of unconstitutional police conduct by breaking the causal connection between the illegal conduct and the confession.' " People v. Austin, 293 Ill. App. 3d 784, 788 (1997), quoting People v. Turner, 259 Ill. App. 3d 979, 993 (1994). Such circumstances support a finding of attenuation when they are capable of inducing a voluntary desire to confess. Wilberton, 348 Ill. App. 3d at 86. Such circumstances may include the confrontation of defendant with untainted evidence implicating him in an offense (see Berry, 314 Ill. App. 3d at 16-17; Wilberton, 348 Ill. App. 3d at 86; People v. White, 117 Ill. 2d 194, 225-26

(1987)) or an independent search that yielded sufficient probable cause to place defendant in police custody (see Tingle, 279 Ill. App. 3d at 715).

Here, defendant offered his initial statement to Detective Fassl after being transported to and shown around Villalobos' apartment, which still contained physical evidence of the murder. The crime scene was evidence that was lawfully obtained prior to defendant's arrest and, considering that defendant's statement to Fassl ensued almost immediately following his arrival at that location, apparently induced defendant to tender his initial confession. Defendant argues that the crime scene, while lawfully obtained, did not inhere any physical evidence actually implicating defendant in Villalobos' murder. We tend to agree. Here, there was no eyewitness account or identification implicating defendant in the offense, nor was any physical evidence recovered from defendant's person or his belongings. The circuit court did have the anonymous tip implicating defendant in the crime, but discounted it, and rightly so. Also, we cannot help but consider that defendant most likely would not have been confronted with the crime scene had he not been unlawfully detained by Fassl. Other than the reaction it inspired in defendant, the crime scene had no real independent intervening effect on his illegal detention, one that would have given police probable cause to detain and question him about the murder. Accordingly, we cannot conclude that defendant's transportation to the crime scene induced the necessary *voluntary* desire to confess. Nor can we conclude that the intervening circumstances weigh in favor of a finding of attenuation.

We lastly examine the purpose and flagrancy of police misconduct in affecting defendant's desire to confess. "Police action is flagrant where the investigation is carried out in such a manner as to cause surprise, fear, and confusion, or where it otherwise has a 'quality of

purposefulness,' *i.e.*, where the police embark upon a course of illegal conduct in the hope that some incriminating evidence (such as the very statement obtained) might be found." People v. Jennings, 296 Ill. App. 3d 761, 765 (1998). Such misconduct can include mistreatment of the defendant such as the deprivation of food, drink, and the opportunity to sleep. Wilberton, 348 Ill. App. 3d at 89.

Here, while only defendant's testimony indicated any mistreatment at the hands of police officers, Detective Fassl admitted that it was his objective in questioning defendant and in transporting him to the crime scene to elicit a confession. We can only surmise that Fassl's technique amounted to an exploitation of defendant's illegal detention. Fassl had no other evidence to corroborate the discredited anonymous tip implicating defendant and as such had no probable cause to hold defendant in his attempts to elicit defendant's confession. Accordingly, we find that this factor weighs in favor of suppression.

Because the two key Brown factors militate against a finding of attenuation, we find that the circuit court erred in denying defendant's motion to suppress his statements to Detective Fassl and ASA Papa. The use of an involuntary confession as substantive evidence of a defendant's guilt is never harmless error and requires reversal of any convictions obtained on such a basis. See People v. Woods, 184 Ill. 2d 130, 150 (1998); People v. Clay, 349 Ill. App. 3d 517, 526 (2004). Accordingly, we reverse each of defendant's convictions and remand for a new trial in which defendant's statements will be suppressed.

Defendant has raised other arguments on appeal concerning the sufficiency of the evidence to sustain his conviction for armed robbery, the instructions issued to the jury by the circuit court, the prosecutor's closing arguments, and the compulsory extraction of his DNA as a

component of his sentence.  In light of our decision to reverse his convictions, we need not

address these issues.  See <u>People v. Austin</u>, 293 Ill. App. 3d 784, 791 (1997).

Reversed and remanded.

CAMPBELL, J., and MURPHY, J., concur.