SECOND DIVISION
May 22, 2007

No. 1-06-0074

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| TREVELLE JACKSON, | ) | Honorable |
| | ) | Thomas R. Sumner, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

The jury in this murder trial watched the videotape where defendant Trevelle Jackson described how he took part in the fatal shooting of Anthony Redmond. Based on the defendant's oral and videotaped confessions and little else, the jury found the defendant guilty of first degree murder. He was sentenced to 40 years in prison. The only issue in this appeal is whether the defendant's confessions were admissible.

Before trial, the trial court granted the defendant's motion to quash arrest based on a lack of probable cause. Then the court denied defendant's motion to suppress statements he made to police, finding the statements were voluntary and were sufficiently attenuated from the illegal arrest. On appeal, defendant makes two claims: his conviction should be reversed because his confessions were the fruit of his illegal arrest, and

1-06-0074

the length and circumstances of his detention show his confessions were not voluntary. We conclude the trial court erred when it found attenuation. We reverse the defendant's conviction and remand this cause for a new trial.

FACTS

The defendant's first trial ended in a mistrial after the jury failed to reach a verdict. At the second trial, evidence was presented that on June 19, 2001, at approximately 12:20 p.m., Anthony Redmond was shot and killed by the defendant and Larry Chatman. The shooting took place outside the Spin Cycle Laundromat at 4258 West Madison Street in Chicago.

Because attenuation issues are fact-intensive, we set out the relevant facts in some detail.

Before the first trial, the court held a hearing on defendant's motion to quash arrest. Chicago police officer Renata Keating testified that on June 19, 2001, at approximately 1:30 p.m., she received an assignment to go to 2110 West Randolph Street for a "person wanted call." She found defendant at the address and asked the defendant if he would be willing to go to the Area 4 police station to speak with detectives regarding a homicide. The defendant agreed to accompany her to the station. The defendant was not handcuffed or read his Miranda rights. They arrived at Area 4 between 1:30 and 2 p.m. Keating placed

2

the defendant in an interview room at the station. Keating locked the door on her way out. Keating asked no questions of the defendant. She informed detectives James Sanchez and Gus Vasilopoulos that defendant was at the station.

At about 2:30 p.m., detectives Sanchez and Vasilopoulos spoke with the defendant in the interview room at Area 4. The conversation lasted 15 to 20 minutes. Sanchez introduced himself to the defendant and advised him of his Miranda rights. The defendant said he understood his rights. The defendant said he was at the house at 2110 West Randolph where a shooting occurred at 9:15 that morning. He denied any knowledge of the shooting at the laundromat.

The detectives called for an evidence technician to administer a gunshot residue test on the defendant. The technician arrived and administered the test. The technician noticed a black smudge on defendant's waistline that appeared to be gunshot residue. He inventoried the defendant's shirt and took possession of it for testing. Defendant was given another shirt to wear. The detectives locked the door when they left the room.

Sanchez said he continued to try to locate witnesses until 8 or 9 p.m. on June 19th, then went home. He said that at that time the defendant was not free to leave "[b]ecause we had not

located witnesses and our investigation was still ongoing."

Detective John Pellegrini testified he formally placed the defendant under arrest on June 21, 2001, at approximately 4:30 p.m., after defendant made admissions concerning the shooting. Until that time, the defendant denied any involvement in the crime.

The trial court granted defendant's motion to quash arrest. The judge found the police had no probable cause to arrest defendant until he confessed. He found the defendant voluntarily went to the police station on June 19th at 1:30 p.m. The judge did not identify the precise moment defendant was placed under arrest, but said it was on June 19th before Detective Sanchez went home at the end of his shift. He said the fact that Officer Keating locked the door to the interview room did not necessarily mean defendant was under arrest because it could simply be a habit. The State does not challenge the court's decision to quash the arrest.

The court held a second hearing to decide the State's motion for attenuation, together with the defendant's motion to suppress statements. At the hearing, Detective Sanchez repeated his testimony about his interview with the defendant at 2:30 p.m. on June 19. In that interview, following the reading of his Miranda rights, the defendant said someone named "Tricky" shot at his

4

aunt's house that morning.  The defendant denied any knowledge of or involvement in the Redmond murder.

At approximately 4 p.m., witness Sonya Haggard came to the station to view a lineup that included the defendant.  She was not able to make an identification.  Following the lineup, the detectives continued to try to locate witnesses.

At 8:30 p.m. on the 19th, the detectives spoke with the defendant again.  First they read defendant his <u>Miranda</u> rights.  Defendant again denied knowledge of the shooting.

On June 20th, at 8:30 or 9 a.m., Detective Sanchez checked in on the defendant, took him to the restroom, and gave him breakfast.  Detectives Sanchez and Pellegrini returned defendant to the interview room.  They spoke with the defendant for 15 to 30 minutes.  Detective Pellegrini read defendant his <u>Miranda</u> rights.  The defendant said he had not told the truth earlier.  He said a woman named Shaquala had told him Larry Chatman had killed Redmond.  Defendant again denied his involvement in the shooting.  The detectives asked defendant to take a lie detector test.  Defendant agreed to take the test.

At 3:30 p.m., detectives Sanchez, Pellegrini, and Vasilopoulos took defendant to the Homan Square police facility where he was given a polygraph test.  Detective Kevin Howley, who administered the test, said he gave the defendant a consent form

that contained Miranda warnings.  Defendant appeared to read the form then signed his name.  The test lasted a little over three hours.  At the conclusion of the test, Howley told the detectives the test indicated deception as to defendant's knowledge of and involvement in the shooting.

The detectives told the defendant he had failed the test.  The defendant repeated a statement he had made during the polygraph test.  He said that on June 19th, Redmond and his friend Parish Lundy, a/k/a "Tricky," drove by the house at 2110 West Randolph Street.  Defendant's cousin, Byron Logan, told him Redmond "just shot up his house, and he was going to go get him."  Later that day, the defendant saw Byron, Cornelius Jackson, and Larry Chatman driving up Lake Street.  The defendant then walked back to the house on Randolph.  Following the statement, the detectives transported defendant back to Area 4.  On the way back, they stopped and purchased food for the defendant.

At around 8 p.m., the detectives spoke with the defendant for 15 to 20 minutes in the interview room at Area 4.  Pellegrini first reminded defendant of his Miranda warnings.  They told him he was not being truthful with them.  The defendant repeated his earlier statement.  He also said that after he returned to the house on Randolph, he saw Byron's girlfriend Fallon holding a box of nine-millimeter bullets.  Fallon told him Byron had dropped

6

the bullets off and asked her to get rid of them.  Fallon then dropped them in a sewer behind the house.  A girl named Shaquala pulled up and told them that Chatman had killed Redmond.

Following defendant's statement, the detectives went to the address and found nine-millimeter bullets in the sewer behind the house.  After the crime lab arrived, the detectives returned to Area 4.

At around 9:30 p.m., they spoke with the defendant for about 20 minutes.  They reminded the defendant of his <u>Miranda</u> rights. Defendant repeated his previous statements.  He denied involvement in the murder.

Detective Sanchez had no further contact with the defendant. He denied ever "feeding" the defendant information about the shooting.  He denied ever threatening or striking the defendant during his detention.  All the detectives who testified denied that defendant ever was handcuffed.

On June 21, 2001, at about 9 a.m., detectives Pellegrini and Vasilopoulos gave the defendant breakfast and took him to the restroom.  Pellegrini told defendant they were going to locate witnesses so he could participate in a lineup.  They returned at about 1:30 p.m.  They gave defendant some food.  Defendant asked to use the restroom.

At around 2 p.m., as the detectives were escorting the

defendant to the restroom, the defendant saw Detective Jacqueline Mok sitting at a computer. The defendant asked them if he could speak alone with Mok. He said he knew her when she was a tactical officer in the 13th District. Mok was not part of the investigation at that time. She worked in the property crimes division.

Pellegrini put defendant back in the interview room. He spoke with Mok for about five minutes outside the defendant's presence. He explained the basic facts of the investigation and asked her if she knew the defendant. She said she did and agreed to speak with him.

At 3 p.m., Mok went into the interview room to speak with the defendant. The conversation lasted about 10 minutes. The defendant told her he wanted to talk about the case. Mok advised him of his <u>Miranda</u> rights, and defendant said he understood.

Defendant asked Mok what he should do. Mok told him he should tell the truth. Defendant said he was scared because his boys might kill him if he told the truth. Mok told him he had to tell the whole truth, 100% of the truth, not 90%, because otherwise they wouldn't believe anything he had to say. She told the defendant that if he was afraid of his boys, she would drive him to his father's house to get him out of the neighborhood. Defendant said he wanted to tell the truth. Mok told him she had

8

to get Detective Pellegrini. Defendant said that was fine.

When Mok and Pellegrini returned to the interview room, Pellegrini re-advised the defendant of his <u>Miranda</u> rights. They proceeded to speak with the defendant for about an hour-and-a-half. For the first time, defendant implicated himself in the killing of Anthony Redmond. The defendant said he was at his cousin Byron's house when Redmond and Tricky drove by and shot at the house. Defendant and Byron then went to Cornelius Jackson's house and met with Larry Chatman. The four of them got in a car to look for Redmond. They stopped at the house of a girl named Tasha. Jackson went inside, got a gun, and came back out. They began driving and saw Redmond's car in the parking lot of a laundromat. They parked the car. Chatman walked to the side of the building and looked to see if Redmond was inside. When Redmond came out, Chatman ran up to him and shot him numerous times. He ran back to the car, and they drove away.

Pellegrini told the defendant they knew he was not being entirely truthful because the investigation showed there were two shooters. He told defendant that when they located more witnesses, the witnesses would come in to identify defendant in a lineup. Defendant then said he would tell the whole truth. He repeated his story, except he said Jackson retrieved two handguns from Tasha's house. Jackson gave one gun to Chatman and one to

9

the defendant. When they arrived at the laundromat, Chatman and the defendant got out of the car. As Redmond left the laundromat, both defendant and Chatman ran up to him and began shooting. Defendant shot three times, and Redmond started to run away. Chatman continued to shoot Redmond as he lay on the ground.

Mok testified that when she first went in to speak with the defendant, she thought he was a witness to the shooting. She said she did not observe any injuries on the defendant, nor did he tell her he had been abused by any police officers.

Detective Pellegrini testified that at about 9 p.m., the defendant participated in lineups and was identified by two witnesses. No witnesses identified the defendant at trial or testified about identifying the defendant in a lineup. The State did not rely on a lineup identification during the attenuation hearing or in this appeal.

At 10 p.m., Mok and Assistant State's Attorney Peter Guy Lisuzzo spoke with the defendant. Lisuzzo advised defendant of his <u>Miranda</u> rights and talked with the defendant for 30 to 45 minutes. They left the room and returned 15 to 20 minutes later. Lisuzzo offered the defendant four options to memorialize his statement. The defendant chose a videotaped statement. The statement was taken at 1:42 a.m. on June 22, 2001. The defendant

said he was giving the statement freely, and no threats or promises had been made to him in exchange for the statement.  The defendant did not tell Lisuzzo he had been mistreated by the police.  The videotaped statement was substantially similar to defendant's oral confession, with more details.  Mok was present during all of the videotaped confession.  She said nothing.

The defendant took the stand and testified he was 21 years old and had attended high school until the ninth grade.  He identified photographs taken of his head and torso on June 26, 2001.  He said the photos showed bruising on his rib cage, chest, back, and behind the ear.  He said the bruising and redness resulted from Detective Sanchez hitting him over 20 times while he was in custody.  Detective Sanchez also threatened that he would "kick [defendant's] ass."

The defendant denied receiving Miranda warnings from any of the officers.  He said he asked to use the phone several times, but was denied.  His right hand was handcuffed to the wall the entire time he was in the interview room.  He was not able to sleep because he had to kneel on the floor with his arm attached to the wall.

The defendant said he saw Detective Mok on June 20th, when she poked her head in the door of the interview room, then left. She came into the room and told the defendant they "told her all

11

about it," and defendant "might as well tell them."  Mok told him she would be back the next day.  The next morning, on June 21st, Mok came back to the room.  Defendant had not asked to see her. He asked her whether he could use the telephone.  He was not allowed to use it.  He told her Sanchez had been beating him. She told him, "You might as well tell him something."

Defendant testified that before the videotaped statement, he never told any of the detectives what happened.  He said Detective Sanchez "fed" him the details about the shooting he described in his videotaped statement.

In rebuttal, Detective Mok testified defendant never asked to use the phone.  She denied peeking in the room on June 20th. Defendant never told her Sanchez had beaten him or threatened him.

Ulysses Johnson, an EMT at Cermak Health Services, performed a physical examination of the defendant on June 23, 2001, as part of the intake process at the jail.  Johnson did not note any injuries on defendant's body.  Defendant did not complain of any injuries.

The trial court denied defendant's motion to suppress statements and granted the State's motion for attenuation.  The judge said he did not believe defendant's testimony that he was beaten.  He said the photographs showed nothing.  He did not

believe defendant's testimony that none of the officers gave him Miranda warnings.  Nor did he believe the officers' testimony that they read defendant his rights every time they entered the room.  He said the truth lay somewhere in between.  The judge found the defendant was under arrest for about 40 hours before he gave a statement.  The videotape was evidence that defendant's statement was voluntary because defendant testified he had an opportunity to say whatever he wanted.  The judge believed the officers' testimony that defendant asked to speak with Detective Mok.

At defendant's second trial, police officers testified regarding the call of shots fired at 2110 West Randolph on the morning of June 19th, and the listing of "Ant" and "Tricky" as possible offenders.

Sonya Haggard testified she was at the Spin Cycle Laundromat at 4258 West Madison Street at about 12:15 p.m. on June 19th.  She saw two men standing outside.  The bigger man yelled, then both men pulled guns from their waistbands and began shooting at the victim.  The bigger man shot the victim a few times after he fell.  Haggard did not get a good look at the smaller man and was not able to identify him during a lineup.  In a later lineup, she identified Larry Chatman as the other shooter.

Jacob Wilder also testified he saw two people shoot the

13

victim. In July 2001, Wilder identified the bigger shooter in a lineup. He did not say he identified the defendant in a lineup. Neither Haggard nor Wilder identified the defendant at trial.

A latent print examiner could not find any identifiable fingerprints on 11 discharged cartridge cases. A gunshot residue analysis performed on defendant's hands and T-shirt revealed particles consistent with gunshot residue. The trace evidence analyst was not able to make a conclusive finding of gunshot residue based on a lack of at least three unique particles. On cross-examination, he said the tests were "negative" for gunshot residue.

Defendant's videotaped statement was played for the jury. On the tape, defendant said Redmond shot at the house where he was staying. Later that day, the defendant and three other people drove around looking for Redmond. When they saw Redmond's car at the laundromat, the defendant and Chatman got out and shot Redmond as he left the building.

The defendant did not testify or offer any evidence. The jury returned a verdict of guilty of first degree murder and a finding that defendant personally discharged a firearm at the time of the offense. Defendant received a sentence of 40 years' imprisonment.

DECISION

I. Attenuation

The defendant contends his confessions should have been suppressed because they were the product of his illegal arrest. The determination that a defendant's arrest was illegal does not resolve the issue of whether the subsequent confession is admissible. People v. Foskey, 136 Ill. 2d 66, 85, 554 N.E.2d 192 (1990). The relevant inquiry is whether the confession was obtained by exploitation of the illegality of the arrest. Brown v. Illinois, 422 U.S. 590, 600, 45 L. Ed. 2d 416, 425, 95 S. Ct. 2254, 2260 (1975). Evidence obtained following an illegal arrest need not be suppressed if such evidence was obtained " 'by means sufficiently distinguishable to be purged of the primary taint of illegality.' " People v. White, 117 Ill. 2d 194, 222, 512 N.E.2d 677 (1987), quoting Wong Sun v. United States, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963).

"The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive." Brown, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261. The analysis under the fourth amendment is distinct from the "threshold requirement" of voluntariness under the due process clause. People v. Lekas, 155 Ill. App. 3d 391, 411, 508 N.E.2d 221 (1987).

Factors to be considered in determining whether a confession

15

1-06-0074

was the product of an illegal arrest are: (1) whether <u>Miranda</u> warnings were given; (2) the proximity in time between the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the police misconduct. <u>Brown</u>, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. Intervening circumstances and police misconduct are considered the key factors in attenuation analysis. <u>People v. Wilberton</u>, 348 Ill. App. 3d 82, 85, 809 N.E.2d 745 (2004).

The State has the burden of proving attenuation. <u>Foskey</u>, 136 Ill. 2d at 86; <u>White</u>, 117 Ill. 2d at 222. The State must show by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. <u>People v. Watson</u>, 315 Ill. App. 3d 866, 881, 735 N.E.2d 75 (2000).

Traditionally, where the disposition of a suppression motion turns on factual determinations and credibility assessments, the circuit court's factual findings will be upheld on review unless they are against the manifest weight of the evidence. <u>People v. Pitman</u>, 211 Ill. 2d 502, 512, 813 N.E.2d 93 (2004). However, a reviewing court is free to make its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. <u>Pitman</u>, 211 Ill. 2d at 512. We review <u>de novo</u> the ultimate question of

16

whether defendant's confessions should have been suppressed on fourth amendment grounds. <u>Pitman</u>, 211 Ill. 2d at 512; <u>People v. Scott</u>, 366 Ill. App. 3d 638, 646, 852 N.E.2d 531 (2006); <u>People v. Wilberton</u>, 348 Ill. App. 3d 82, 85, 809 N.E.2d 745 (2004).

A. Presence of <u>Miranda</u> Warnings

"Although police cannot dissipate the taint of an illegal arrest simply by giving <u>Miranda</u> warnings, the presence of the warnings prior to interrogation carries some weight." <u>Wilberton</u>, 348 Ill. App. 3d at 85.

Here, the trial court did not believe the officers' testimony that they read defendant his rights on each and every occasion he was interviewed. Nor did the trial court believe defendant when he said none of the officers gave him <u>Miranda</u> warnings. The court found, "the truth lies somewhere in between." The trial court did not determine the number of times he believed <u>Miranda</u> warnings were given or when they were given. While defendant may not have been advised of his rights before every interrogation session, we find he was advised of his <u>Miranda</u> rights more than once and perhaps several times before he made his incriminating statement to detectives Mok and Pellegrini.

But the presence of <u>Miranda</u> warnings cuts both ways in this case. The fact that defendant received <u>Miranda</u> warnings before

17

he made his incriminating statement could be said to indicate he voluntarily waived his rights and agreed to give a statement, which weighs in favor of attenuation. See Wilberton, 348 Ill. App. 3d at 85. On the other hand, the fact that defendant continually received Miranda warnings after denials of guilt supports defendant's contention that the detectives would not accept his denial of any involvement in the murder and would continue questioning him until he confessed.

We find the presence of Miranda warnings does not clearly favor either suppressing or attenuating defendant's confessions.

B. Temporal Proximity of Arrest and Statement

We next consider the proximity in time between defendant's arrest and his confessions. First, we have to determine when and where the illegal arrest and detention took place.

Defendant contends 51 hours passed between his unlawful arrest and his confessions. The trial court found defendant's illegal arrest and detention began when Detective Sanchez left for the evening on June 19, 2001, which indicates defendant was in custody for around 40 hours before confessing.

In People v. Ollie, 333 Ill. App. 3d 971, 984, 777 N.E.2d 529 (2002), we held the giving of Miranda warnings, while not dispositive, is commonly recognized as an indicia of arrest. We held, "a reasonable innocent person, having been advised of his

18

1-06-0074

*Miranda* rights, having stated that he knew nothing about the crime in question, and having been returned to the interview room rather than released, would not have believed he was free to go." *Ollie*, 333 Ill. App. 3d at 984.

In this case, Detectives Sanchez and Vasilopolous interviewed defendant at about 2:30 p.m. on January 19, 2001. Upon entering the interview room, they immediately advised defendant of his *Miranda* rights. The detectives then questioned defendant for 15 to 20 minutes. Defendant denied any knowledge of or involvement in the murder. After noticing a smudge mark on defendant's t-shirt, the detectives notified the crime lab and submitted his shirt for a gunshot analysis. Defendant was given another shirt to wear. The detectives then left defendant in the locked interview room while they went to look for witnesses. Defendant made his first incriminating statement at around 4:30 p.m. on June 21, 2001, 50 hours after the first interview.

We conclude a reasonable innocent person, having been advised of his *Miranda* rights, having stated that he knew nothing about the murder in question, having had his shirt removed for a gunshot residue analysis, and having been kept in a locked interview room rather than released after questioning, would not believe he was free to go. See *Ollie*, 333 Ill. App. 3d at 984. We find defendant was placed under arrest when Detectives Sanchez

19

and Vasilopolous read him his <u>Miranda</u> rights in a locked interview room during his first interview, which, according to Detective Sanchez's testimony, occurred sometime around 2:30 p.m. on January 19, 2001. We find defendant was illegally detained for at least 50 hours before he confessed, not 40 hours as the trial court found. The trial court's finding was against the manifest weight of the evidence.

A lapse of time may dissipate the taint of an illegal arrest by allowing the accused to reflect on his situation. <u>Scott</u>, 366 Ill. App. 3d at 647; <u>Wilberton</u>, 348 Ill. App. 3d at 85. However, the length of time between the illegal arrest and a confession is an ambiguous attenuation factor at best. <u>People v. Klimawicze</u>, 352 Ill. App. 3d 13, 19, 815 N.E.2d 760 (2004); <u>People v. Vega</u>, 250 Ill. App. 3d 106, 117, 620 N.E.2d 1189 (1993). " '[W]here intervening circumstances are present, a long period between arrest and confession may support the inference that it was the intervening circumstances, and not the illegal arrest, which prompted the confession. However, where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess.' " <u>Klimawicze</u>, 250 Ill. App. 3d at 19, quoting <u>White</u>, 117 Ill. 2d at 224.

Here, defendant was questioned about eight times during the 50-hour period, with each session lasting only a short amount of

time. While we recognize the defendant was not relentlessly questioned while in custody, we note the questioning proceeded in a clockwork fashion, despite defendant's repeated denials of any involvement in the murder. The inordinate length of defendant's detention allowed the detectives to exploit his illegal arrest. We find the 50-hour period between defendant's arrest and his confessions weighs against attenuation.

C. Intervening Circumstances

This factor requires us to examine the events that occurred between the first moment of the unlawful detention and the defendant's confessions, some 50 hours later. That is because the mere fact that the defendant was unlawfully arrested does not mean the subsequent confessions are inadmissible, People v. Bates, 218 Ill. App. 3d 288, 297-98, 578 N.E.2d 240 (1991), although the initial illegality does create a primary taint which, if not sufficiently purged, will result in suppression. White, 117 Ill. 2d at 222. We will not apply a simple "but for" test; the statements must have been obtained by exploitation of the police illegality. Brown, 422 U.S. at 598-99, 45 L. Ed. 2d at 424, 95 S. Ct. at 2259.

The fact that the trial court found no physical abuse or coercion, a finding we accept, does not resolve the fourth amendment issues that have been raised. Absence of physical

21

abuse or coercion "merely establishes the threshold requirement for admissibility." White, 117 Ill. 2d at 223.  The question we must resolve is whether the State has proved the existence of some intervening circumstance that broke the " 'causal connection between the illegal conduct and the confession.' "  People v. Austin, 293 Ill. App. 3d 784, 788, 688 N.E.2d 740 (1997), quoting People v. Turner, 259 Ill. App. 3d 979, 993, 631 N.E.2d 1236 (1994).

What kind of intervening circumstance will break the causal connection and eliminate the taint of illegality?  It has to be something that induces a voluntary desire to confess.  Wilberton, 348 Ill. App. 3d at 86.  It cannot be something that was obtained illegally--statements from unlawfully arrested codefendants, for instance.  People v. Clay, 349 Ill. App. 3d 517, 524, 812 N.E.2d 473 (2004).  Nor can it be information obtained by exploiting the illegality of the defendant's detention.  People v. Simmons, No. 1-05-3618 (Ill. App. Ct., April 18, 2007) (witness found through defendant's statement during unlawful detention is not a sufficient intervening circumstance.)  This court recently found taking an illegally held suspect to a bloody crime scene, thus inducing a confession, cannot be said to be an intervening circumstance that dissipates the taint of illegality because "defendant most likely would not have been confronted by the

22

crime scene had he not been unlawfully detained by Officer Fassl." People v. Scott, 366 Ill. App. 3d 638, 648, 852 N.E.2d 531 (2006). We also have said a confession obtained by showing the defendant his unlawfully obtained bloody shoes remains tainted by illegality. Turner, 259 Ill. App. 3d at 993.

Our supreme court has held a polygraph examination conducted during the defendant's illegal detention is a consequence of that detention and a form of interrogation, excluding it from consideration as an intervening circumstance. People v. Franklin, 115 Ill. 2d 328, 334, 504 N.E.2d 80 (1987). We do not consider the polygraph examination of defendant in this case to be an intervening circumstance.

Where an intervening circumstance has been held sufficient to break the causal chain it has been new information, untainted by illegality. Bates, 267 Ill. App. 3d at 506. See, for example, Wilberton, 348 Ill. App. 3d at 88-89 (a co-defendant's lawfully obtained statement incriminating the defendant is sufficient to purge the taint of illegality.) See also People v. Gabbard, 78 Ill. 2d 88, 398 N.E.2d 574 (1979) (showing defendant a sketch of the man identified as committing the crime was a sufficient intervening circumstance); In re R.S., 93 Ill. App. 3d 941, 946-47, 418 N.E.2d 195 (1981) (showing defendant a stolen clock seized pursuant to a valid search warrant was enough to

attenuate illegality.)  In addition, the fact that a defendant's confession was given to officers other than those who unlawfully arrested him is not a sufficient intervening circumstance, even though those officers know little or nothing about the circumstances of defendant's arrest.  White, 117 Ill. 2d at 225.

One constant strain runs throughout the decisions: an intervening circumstance sufficient to dissipate the taint must be independent of the unlawful arrest.  See People v. Morris, 209 Ill. 2d 137, 159, 807 N.E.2d 377 (2004) ("The information giving rise to probable cause was obtained independently of defendant's illegal arrest."); Wilberton, 348 Ill. App. 3d at 88 ("Probable cause arose independently of defendant's arrest, weighing heavily in favor of attenuation.")

The State relies on the unplanned, unanticipated appearance of Detective Mok and the events that followed to establish intervening circumstances sufficient to attenuate the confessions.  The State contends the confessions were volunteered, not made in response to police interrogation, therefore not an exploitation of illegality.  We do not agree.

Like the different interrogating officers in Morris, the finding of witnesses in Simmons, and the viewing of the bloody crime scene in Scott, the defendant's request to talk to Detective Mok in the interrogation room was not independent of

24

the chain of illegality. It was an integral part of it. Further, contrary to the State's contention, we believe the defendant's confessions, oral and tape-recorded, were obtained through interrogation and were not volunteered.

Before entering the interrogation room, Detective Mok met with the investigating officer for five minutes. Once in the interrogation room the first thing she did was give defendant Miranda warnings. She told him to tell the truth, the whole truth, not 90 percent of it. When he said he was scared his boys might kill him if he told the truth, she offered to protect him. She asked no questions. Instead, she left the room and came back with Detective Pellegrini, who again advised the defendant of his rights. The detectives spoke to the defendant for 90 minutes, posing questions. Later, he gave a videotaped confession where Detective Mok was present, but she said nothing to the defendant.

"Interrogation" refers to express questioning as well as "any words or actions on the part of the police, other than those normally accompanying arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from a suspect." People v. Olivera, 164 Ill. 2d 382, 391-92, 647 N.E.2d 926 (1995), citing Rhode Island v. Innis, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90 (1980). See, e.g., Brewer v. Williams, 430 U.S. 387, 401, 51 L. Ed. 2d

25

1-06-0074

424, 97 S. Ct. 1232, 1241 (1977) (police officer interrogated defendant when he said, "the parents of this little girl should be entitled to a Christian burial***")  The focus is primarily on the perceptions of the suspect, rather than the intent of the police.  Olivera, 164 Ill. 2d at 392.  But see People v. Jones, 337 Ill. App. 3d 546, 552-53, 786 N.E.2d 243 (2003) (police officer saying to defendant he had found a handgun in defendant's vehicle after a traffic stop was not interrogative because it was not reasonably likely to elicit an incriminating response.)

We find Detectives Mok and Pellegrini knew their words and actions were likely to elicit incriminating responses from the defendant.  Those responses led directly to the videotaped confession elicited by an assistant state's attorney.  As held in Innis and Brewer, no formal questions are required to constitute a police interrogation.  This defendant was interrogated.  It was an exploitation of the initial illegality, not an intervening circumstance.

D. Purpose and Flagrancy of Police Misconduct

The presence of purposeful and flagrant police misconduct weighs against attenuation.  Klimawicze, 352 Ill. App. 3d at 23; Wilberton, 348 Ill. App. 3d at 89.  "Police action is flagrant where the investigation was carried out in such a manner to cause surprise, fear, and confusion, or where it otherwise has a

26

'quality of purposefulness,' i.e., where the police embark upon a course of illegal conduct in the hope that some incriminating evidence (such as the very statement obtained) might be found." People v. Jennings, 296 Ill. App. 3d 761, 766, 695 N.E.2d 1303 (1998), citing Foskey, 136 Ill. 2d at 86.

In Scott, 366 Ill. App. 3d at 648, this court held the presence of purposeful and flagrant police misconduct weighed in favor of suppression.  While only the defendant's testimony indicated any mistreatment at the hands of the police officers, the detective admitted his objective in questioning defendant and transporting him to the crime scene was to elicit a confession. The court held the detective's technique "amounted to an exploitation of defendant's illegal detention."  Scott, 366 Ill. App. 3d at 648.  The detective had no other evidence to discredit the anonymous tip implicating the defendant, and therefore had no probable cause to hold the defendant in his attempts to elicit the defendant's confession.  Scott, 366 Ill. App. 3d at 648.

As in Scott, the conduct of the detectives in this case suggests the presence of purposeful and flagrant police misconduct.  While the detectives did not specifically testify that their purpose in questioning defendant and transporting him to the police station was to elicit a confession, Detective Sanchez said they were looking for witnesses in the ongoing

27

investigation while defendant was in the locked room. We believe their purpose was to investigate and gather incriminating evidence regarding defendant's involvement in the murder. Even though defendant repeatedly denied any involvement in the murder, the detectives detained him alone in a locked interview room for 50 hours, removed his shirt to test for gunpowder residue, subjected him to a polygraph examination, and conducted an eyewitness line-up identification, which failed to identify him as one of the suspects. The questioning process was entirely investigatory in nature. The officers detained defendant for 50 hours in order to conduct a "fishing expedition" to establish probable cause. See Simmons, No. 1-05-3618, slip op. at 18 ("We agree with defendant's assertion that officers rounded up defendant and then conducted a fishing expedition in order to establish probable cause"); Jennings, 296 Ill. App. 3d at 766.

We find the detectives' flagrant and purposeful misconduct "amounted to an exploitation of defendant's illegal detention." See Scott, 366 Ill. App. 3d at 648. This factor weighs against attenuation.

II. Voluntariness

To determine whether a defendant's confession was voluntary, courts consider the totality of the circumstances, including the defendant's age, intelligence, education, experience, and

28

physical condition at the time of the detention and interview; whether <u>Miranda</u> warnings were issued; whether the defendant suffered any physical or mental abuse; and the legality and duration of the detention. <u>People v. Willis</u>, 215 Ill. 2d 517, 536, 831 N.E.2d 531 (2005); <u>People v. Woodard</u>, 367 Ill. App. 3d 304, 314, 854 N.E.2d 674 (2006).

We review <u>de</u> <u>novo</u> the trial court's ultimate decision on the motion to suppress. <u>People v. Nicholas</u>, 218 Ill. 2d 104, 116, 842 N.E.2d 674 (2006). The trial court's factual findings, however, are given deference and will be accepted unless manifestly erroneous. <u>Nicholas</u>, 218 Ill. 2d at 116. "Manifestly erroneous means arbitrary, unreasonable and not based on the evidence." <u>People v. Ballard</u>, 206 Ill. 2d 151, 162, 794 N.E.2d 788 (2002).

In this case, the record reflects defendant was 20 years old at the time of his questioning and had 9 prior contacts with the police. While the trial court did not believe the officers' testimony that they read defendant his rights every time they entered the room, it also did not believe defendant's testimony that none of the officers gave him <u>Miranda</u> warnings. The court found the truth rested somewhere in between. The trial court also did not believe defendant's testimony that he was beaten during questioning. Johnson, an EMT, did not note any injuries

29

on defendant's body during the intake process at the county jail. In denying defendant's motion to suppress, the court found the videotape showed defendant's statement was voluntary because defendant had an opportunity to say whatever he wanted. The court also believed Detective Mok's testimony that defendant asked to speak to her. We have reviewed the videotape and we find no evidence defendant was abused or maltreated in a way relevant to our voluntariness analysis.

After reviewing the record, we find the trial court did not err in denying defendant's motion to suppress his statements on involuntariness grounds. See <u>Willis</u>, 215 Ill. 2d at 537-39 (defendant's confession was voluntary even though he was held in detention for 73 hours prior to confessing.)

CONCLUSION

We conclude the State did not prove attenuation by clear and convincing evidence. For that reason we reverse the defendant's conviction and sentence and order that the confessions made by the defendant be suppressed. In accord with the holding in <u>Olivera</u>, 164 Ill. 2d at 393, we find the evidence submitted at trial is sufficient to support a guilty verdict. We therefore remand this cause for a new trial.

Reversed and remanded.

SOUTH, and HALL, JJ., concur.

1-06-0074